NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-6240-10T1

IMO INDUSTRIES INC.,

    Plaintiff-Appellant/
Cross-Respondent,

v.

TRANSAMERICA CORPORATION, TIG
INSURANCE COMPANY, f/k/a TRANSAMERICA
INSURANCE COMPANY, A.C.E. INSURANCE
COMPANY, LTD., THE CENTRAL NATIONAL
INSURANCE COMPANY OF OMAHA, INSURANCE
COMPANY OF NORTH AMERICA, ACE LTD.,
as successor-in-interest to INSURANCE
COMPANY OF NORTH AMERICA, INDUSTRIAL
UNDERWRITERS INSURANCE COMPANY, CERTAIN
UNDERWRITERS AT LLOYD'S OF LONDON,
CERTAIN LONDON MARKET INSURANCE
COMPANIES, PACIFIC EMPLOYERS INSURANCE
COMPANY, SERVICE FIRE INSURANCE COMPANY,
ZURICH AMERICAN INSURANCE COMPANY,
ZURICH AMERICAN INSURANCE COMPANY OF
ILLINOIS, as successor-in-interest to
ZURICH AMERICAN INSURANCE COMPANY,
AMERICAN ZURICH INSURANCE COMPANY, as
successor-in-interest to ZURICH
AMERICAN INSURANCE COMPANY, ZURICH
INSURANCE COMPANY, as successor-in-
interest to ZURICH AMERICAN INSURANCE
COMPANY, ZURICH INTERNATIONAL LTD.,
ZURICH INSURANCE GROUP, as successor-
in-interest to ZURICH INTERNATIONAL LTD.,
ACE PROPERTY & CASUALTY INSURANCE
COMPANY, as successor-in-interest to
AETNA INSURANCE COMPANY,

    Defendants-Respondents/
Cross-Appellants,
and

---

**APPROVED FOR PUBLICATION**

**September 30, 2014**

**APPELLATE DIVISION**

PYRAMID INSURANCE COMPANY OF BERMUDA, LTD., a/k/a PYRAMID INSURANCE COMPANY, LTD., AETNA CASUALTY AND SURETY COMPANY, a/k/a TRAVELERS CASUALTY AND SURETY COMPANY, TRAVELERS CASUALTY AND SURETY COMPANY f/k/a AETNA CASUALTY AND SURETY COMPANY, TRAVELERS PROPERTY CASUALTY CORP., as successor-in-interest to AETNA CASUALTY AND SURETY COMPANY and TRAVELERS CASUALTY AND SURETY COMPANY, FIREMAN'S FUND INSURANCE COMPANY, INTERSTATE FIRE AND CASUALTY COMPANY, PURITAN INSURANCE COMPANY, WESTPORT INSURANCE CORPORATION, as successor-in-interest to PURITAN INSURANCE COMPANY, TRANSPORT INDEMNITY COMPANY, MISSION AMERICAN INSURANCE COMPANY, as successor-in-interest to TRANSPORT INDEMNITY COMPANY, ASSOCIATED INTERNATIONAL INSURANCE COMPANY, INTEGRITY INSURANCE COMPANY, THE NEW JERSEY PROPERTY-LIABILITY GUARANTY ASSOCIATION on behalf of INTEGRITY INSURANCE COMPANY in insolvency, MIDLAND INSURANCE COMPANY, THE NEW JERSEY PROPERTY-LIABILITY GUARANTY ASSOCIATION on behalf of MIDLAND INSURANCE COMPANY in insolvency, MISSION INSURANCE COMPANY, THE NEW JERSEY PROPERTY-LIABILITY GUARANTY ASSOCIATION on behalf of MISSION INSURANCE COMPANY in insolvency, WESTERN EMPLOYERS INSURANCE COMPANY, THE NEW JERSEY PROPERTY-LIABILITY GUARANTY ASSOCIATION on behalf of WESTERN EMPLOYERS INSURANCE COMPANY in insolvency, YOSEMITE INSURANCE COMPANY,

    Defendants-Respondents,

and

ALLIANZ UNDERWRITERS, INC., ALLIANZ UNDERWRITERS INSURANCE COMPANY, as

2

successor-in-interest to ALLIANZ UNDERWRITERS, INC., ALLIANZ GLOBAL RISKS US INSURANCE COMPANY, as successor-in-interest to ALLIANZ UNDERWRITERS INSURANCE COMPANY, AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA, AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY, as successor-in-interest to GREAT AMERICAN SURPLUS LINES INSURANCE COMPANY, AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY, XL INSURANCE COMPANY, L.T.D., as successor-in-interest to AMERICAN EXCESS INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, AMERICAN RE-INSURANCE COMPANY, AMERICAN INTERNATIONAL UNDERWRITERS, AIU INSURANCE COMPANY, as successor-in-interest to AMERICAN INTERNATIONAL UNDERWRITERS, AMERICAN INTERNATIONAL GROUP, as successor-in-interest to AIU INSURANCE COMPANY, EMPLOYERS MUTUAL CASUALTY COMPANY, FEDERAL INSURANCE COMPANY, FIRST STATE INSURANCE COMPANY, GRANITE STATE INSURANCE COMPANY, GREAT AMERICAN SURPLUS INSURANCE COMPANY, CITY INSURANCE COMPANY, THE HOME INSURANCE COMPANY, as successor-in-interest to CITY INSURANCE COMPANY, COLUMBIA CASUALTY COMPANY, COVENANT MUTUAL INSURANCE COMPANY, COVENANT INSURANCE COMPANY, as successor-in-interest to COVENANT MUTUAL INSURANCE COMPANY, GREAT AMERICAN SURPLUS INSURANCE COMPANY, CITY INSURANCE COMPANY, THE HOME INSURANCE COMPANY, as successor-in-interest to CITY INSURANCE COMPANY, COLUMBIA CASUALTY COMPANY, COVENANT MUTUAL INSURANCE COMPANY, COVENANT INSURANCE COMPANY, as successor-in-interest to COVENANT MUTUAL INSURANCE COMPANY, GREENWICH INSURANCE COMPANY, as successor-in-interest to HARBOR INSURANCE COMPANY, HARBOR INSURANCE COMPANY, INTERNATIONAL SURPLUS LINES INSURANCE COMPANY, INTERNATIONAL INSURANCE COMPANY, as successor-in-

interest to INTERNATIONAL SURPLUS
LINES INSURANCE COMPANY, CRUM AND
FORSTER INSURANCE COMPANY, as
successor-in-interest to INTERNATIONAL
SURPLUS LINES INSURANCE COMPANY,
HIGHLANDS INSURANCE COMPANY, HUDSON
INSURANCE COMPANY, THE INSURANCE
COMPANY OF THE STATE OF PENNSYLVANIA,
LANDMARK INSURANCE COMPANY, LEXINGTON
INSURANCE COMPANY, NATIONAL CASUALTY
COMPANY, NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA, NORTHBROOK
INDEMNITY COMPANY, ALLSTATE INSURANCE
COMPANY, as successor-in-interest to
NORTHBROOK INDEMNITY COMPANY, ROYAL
INSURANCE COMPANY, ROYAL INSURANCE
COMPANY OF AMERICA, as successor-
in-interest to ROYAL INSURANCE COMPANY,
ROYAL INDEMNITY COMPANY, as successor-
in-interest to ROYAL INSURANCE COMPANY,
ROYAL INDEMNITY COMPANY, X.L.,
REINSURANCE AMERICA, INC., as successor-
in-interest to SERVICE FIRE INSURANCE
COMPANY, NATIONAL AMERICAN INSURANCE
COMPANY OF CALIFORNIA, as successor-
in-interest to MISSION AMERICAN
INSURANCE COMPANY, PREMIER INSURANCE
COMPANY, S&H INSURANCE COMPANY,
NATIONAL FARMERS UNION PROPERTY AND
CASUALTY COMPANY, as successor-in-
interest to S&H INSURANCE COMPANY,
TRANSAMERICA PREMIER INSURANCE COMPANY,
as successor-in-interest to PREMIER
INSURANCE COMPANY, TIG PREMIER INSURANCE
COMPANY, as successor-in-interest to
TRANSAMERICA PREMIER INSURANCE COMPANY,
TRANSCONTINENTAL INSURANCE COMPANY,

      Defendants.

_____

Argued March 31, 2014 — Decided  September 30, 2014

Before Judges Yannotti, Ashrafi, and
St. John.

On appeal from Superior Court of New Jersey, Law Division, Morris County, Docket No. L-19-09.

Robin L. Cohen and Kenneth H. Frenchman of the New York bar, admitted pro hac vice, argued the cause for appellant/cross-respondent IMO Industries Inc. (DeCotiis, FitzPatrick & Cole, L.L.P., Kasowitz, Benson, Torres & Friedman, L.L.P., Steven J. Roman (Dickstein Shapiro, L.L.P.) of the D.C. bar, admitted pro hac vice, and Mr. Frenchman, attorneys; Mr. Roman, Jeffrey D. Smith, Ms. Cohen and Elizabeth A. Sherwin, on the brief).

Sherilyn Pastor argued the cause for respondent/cross-appellant Transamerica Corporation (McCarter & English, L.L.P., attorneys; Ms. Pastor and Gregory H. Horowitz, of counsel and on the brief; Nicholas M. Insua, Adam J. Budesheim, Stephanie Platzman-Diamant, and Mark D. Villanueva, on the brief).

Shawn L. Kelly argued the cause for respondent/cross-appellant TIG Insurance Company (Riker Danzig Scherer Hyland & Perretti, L.L.P., attorneys; Mr. Kelly, Ronald Puhala, Sigrid S. Franzblau and Richard C. Kielbania, of counsel and on the brief).

Mark D. Hoerrner argued the cause for respondent Pyramid Insurance Company, Ltd. (Budd Larner, P.C., attorneys; Mr. Hoerrner, Marc I. Bressman and David I. Satine, on the brief).

Patricia B. Santelle argued the cause for respondents/cross-appellants ACE Property & Casualty Insurance Company, Century Indemnity Company, Central National Insurance Company of Omaha, Industrial Underwriters Insurance Company, Pacific Employers Insurance Company, and Service

Fire Insurance Company (White and Williams
L.L.P., attorneys; Ms. Santelle, Gregory S.
Capps, and Paul A. Briganti, on the brief).

Mark J. Leimkuhler (Lewis Baach, P.L.L.C.)
of the D.C. bar, admitted pro hac vice,
argued the cause for respondents/cross-
appellants London Market Insurers (Tompkins,
McGuire, Wachenfeld & Barry, L.L.P., and Mr.
Leimkuhler, attorneys; Mr. Leimkuhler, of
counsel and on the brief; Aisha E. Henry
(Lewis Baach, P.L.L.C.) of the D.C. bar,
admitted pro hac vice, and Matthew P.
O'Malley, on the brief).

Michael A. Kotula argued the cause for
respondents Fireman's Fund Insurance
Company, Interstate Fire & Casualty Company
and Westport Insurance Corporation (Rivkin
Radler, L.L.P., attorneys; Mr. Kotula and
Lawrence A. Levy of the New York bar,
admitted pro hac vice, on the brief).

Coughlin Duffy, L.L.P. and John K. Daly
(Meckler Bulger Tilson Marick & Pearson,
L.L.P.) of the Illinois bar, admitted pro
hac vice, attorneys for respondents/cross-
appellants Zurich American Insurance Company
and Zurich International (Bermuda), Ltd.
(Robert J. Re and Mr. Daly, of counsel and
on the brief; Maida Perez, on the brief).

L'Abbate, Balkan, Colavita & Contini,
L.L.P., attorneys for respondent Transport
Insurance Company (Gretchen B. Connard and
John D. McKenna, on the brief).

Ford Marrin Esposito Witmeyer & Gleser,
L.L.P., attorneys for respondent Travelers
Casualty & Surety Company (James M. Adrian
and Kenneth D. Walsh, on the brief).

Locke Lord L.L.P., attorneys for respondent
CX Reinsurance Company Limited (Richard I.
Scharlat, on the brief).

Norris McLaughlin & Marcus, P.A., attorneys for amicus curiae Independent Energy Producers of New Jersey (Robert Mahoney, on the brief).

The opinion of the court was delivered by

ASHRAFI, J.A.D.

Several parties appeal from a final judgment determining insurance coverage for asbestos-related personal injury claims. Plaintiff IMO Industries, Inc. is the insured and the successor to a manufacturer of industrial products that contained asbestos. Defendants are primary and excess liability insurers, as well as Transamerica Corporation, the former parent company of the predecessor manufacturer.

Over the years, IMO purchased a total of $1.85 billion in insurance coverage from all the defendant insurers. That amount is sufficient to pay for its anticipated liabilities and defense costs for asbestos-related personal injury claims. Nonetheless, IMO initiated this litigation to establish its rights under those insurance policies and to recover money damages.

Among many issues and topics, the appeals present some questions that have not been previously addressed in the New Jersey Supreme Court's insurance allocation decisions for so-called long-tail environmental losses, beginning with Owens-

Illinois, Inc. v. United Insurance Co., 138 N.J. 437 (1994), and

Carter-Wallace, Inc. v. Admiral Insurance Co., 154 N.J. 312

(1998).  We must decide whether the trial court correctly

treated primary insurance policies that pay for all litigation

defense costs "outside the limits," or in addition to, the

indemnification limits of the policies.  We must also decide how

the coverage limits of excess multi-year policies must be

treated in the allocation model.  Additional issues include

whether IMO was entitled to a jury trial on its claims for money

damages, and numerous challenges to the trial court's

interpretation of insurance policies within the Owens-Illinois

and Carter-Wallace allocation methodology.

Having considered the record and the parties' written and

oral arguments, we find no ground to reverse the many rulings of

the several judges who presided over this litigation.  We affirm

the final judgment of the Law Division.

I.

Facts and Procedural History

The Parties

Plaintiff IMO originated in 1901 as the Delaval Steam

Turbine Company.  It manufactured turbines, pumps, gears, and

other machinery with industrial and military uses, including for

United States Navy ships.  In some of Delaval's products

manufactured from the 1940s to the 1980s, component parts contained asbestos.

Defendant Transamerica is a holding company that acquired Delaval in 1963. Delaval operated as a subsidiary of Transamerica under different names until its divestiture in 1986 by means of a spin-off to shareholders. After the divestiture, plaintiff became IMO Industries, Inc.

From the 1960s until 1993, Transamerica owned Transamerica Insurance Company, which became defendant TIG Insurance Company ("TIG") when it was divested in 1993. Transamerica acquired Pyramid Insurance Company of Bermuda in the 1970s and still owned it at the time of this litigation. Transamerica, TIG, and Pyramid are at times collectively referred to in this litigation as the Transamerica defendants.

The other defendants are insurance companies, together with their predecessors and affiliates, that provided different levels of primary or excess liability insurance to plaintiff or Transamerica. Among the excess insurers that have raised issues on appeal are two groups of insurers that we will refer to in this opinion as "ACE" and "LMI."[1] We will also refer to IMO and TIG to mean the present company or its predecessors.

---

[1] "ACE" in this opinion shall mean one or more of the following insurers: ACE Property and Casualty Insurance Company, Century
(continued)

A-6240-10T1

Risk Management Program

In 1972, Transamerica established a corporate risk management program ("TARM") that oversaw insurance matters for its subsidiaries. The objectives of the TARM program were to protect Transamerica and its subsidiaries from catastrophic losses and to minimize costs for insurance coverage and accidental losses. According to Transamerica's director of risk management in the 1980s, the TARM program was never intended to be an insurer for subsidiaries, although Transamerica would often pay losses that fell within a subsidiary's self-insured retention ("SIR"). A SIR operates in some ways like a deductible for an insurance policy but also is significantly different, as we will discuss later in this opinion. The TARM program procured insurance on behalf of Transamerica's subsidiaries in exchange for an annual fee. The fee covered the costs of purchasing insurance, TARM's operating costs, and the subsidiary's share of losses.

_____

(continued)
Indemnity Company, CCI Insurance Company, Insurance Company of North America, Indemnity Insurance Company of North America, Central National Insurance Company of Omaha, Service Fire Insurance Company, Industrial Underwriters Insurance Company, and Pacific Employers Insurance Company.

"LMI" stands for "London Market Insurers" and shall mean one or more of individual Lloyd's syndicates or London Market companies.

A-6240-10T1

Transamerica would charge back its payments covering a subsidiary's SIRs through the risk management fees. Subsidiaries like IMO that experienced unique or significant losses were also charged a catastrophe fee beyond the normal risk management fee. Before its divestiture in 1986, IMO had paid approximately $33 million in such fees to Transamerica.

IMO's Insurance Policies

Before 1964, IMO had general liability policies issued by New Jersey Manufacturers Insurance Company ("NJM") and Aetna Casualty and Surety Company ("Aetna"). From 1964 to 1972, IMO purchased primary insurance directly from TIG. We will refer to these pre-1972 policies as TIG's "direct policies."

From 1972 through 1976, Transamerica purchased insurance on behalf of IMO from the Highlands Insurance Company. The Highlands policies were written above a $100,000 SIR, meaning that IMO's losses must exceed that level of loss from any single occurrence before it could access coverage under the Highlands policies. There was no insurance in place to cover IMO's SIR. TIG also issued excess policies to IMO during this time period.

From 1977 to 1986, Transamerica purchased first-layer excess insurance coverage for IMO from ACE and Pyramid. These policies also required SIRs. To cover the SIRs, Transamerica purchased insurance policies from TIG, which are referred to in

11

this litigation as "fronting policies." These policies allowed IMO to obtain insurance certificates showing full coverage for all losses. The "fronting" reference meant there was no risk assumed by the insurance carrier, here TIG.[2]

The TIG fronting policies had stated coverage limits of $1 million from 1977 through 1984 and higher limits for 1985 and 1986, totaling in the aggregate $10.75 million for the ten-year period. For the fronting policies in effect from 1977 through 1981, defense costs were paid "outside the limits" of the policies. This means that the policies would pay their stated $1 million indemnity limits plus defense costs; the defense costs were supplemental to the indemnification coverage and did not erode the indemnity limits. We will refer to these policies as "outside the limits" policies. Defense costs for the policies in effect from 1982 through 1986 were within the policy

---

[2] "Fronting" means "[t]he use of a licensed, admitted insurer to issue an insurance policy on behalf of a self-insured organization or captive insurer without the intention of transferring any of the risk. The risk of loss is retained by the self-insured or captive insurer with an indemnity or reinsurance agreement. . . . Fronting arrangements allow captives and self-insurers to comply with financial responsibility laws imposed by many states that require evidence of coverage written by an admitted insurer, such as for automobile liability and workers compensation insurance." Fronting, IRMI Risk & Ins., http://www.irmi.com/online/ insurance-glossary/terms/f/fronting.aspx (last visited Sept. 4, 2014); see also Richard V. Rupp, Insurance & Risk Management Glossary 150 (1991) (fronting insurer issues policy on behalf of captive insurer but assumes little or no financial exposure).

limits, meaning payments for defense costs did erode the indemnity limits.

Thus, IMO had "direct policies" from TIG from 1964 through 1972, excess policies at various times including 1972 through 1976, and "fronting policies" from 1977 to 1986, the first five years of which were "outside the limits" policies. Over the years since the 1986 divestiture, TIG made payments totaling more than $30 million for IMO's asbestos liabilities and defense costs from both its direct and fronting policies. Adding TIG's payments from excess policies, TIG paid IMO more than $72 million for its asbestos liabilities and costs.

IMO also received payments from Pyramid's excess policies, including from the time that TIG claimed it had no more responsibility for IMO's losses.

Digressing briefly from the facts to restate the lead issue in this appeal, TIG claims its policies are exhausted because it has paid far more than the amount of loss allocated to it under the <u>Owens-Illinois</u> and <u>Carter-Wallace</u> loss allocation model. IMO contends TIG's obligations have not ended because the indemnification limits of the "outside the limits" policies cannot be exhausted by allocating responsibility to those policies. It contends only actual payments that reach the $1 million dollar indemnification limits will exhaust TIG's

obligation to cover defense costs under the five years of "outside the limits" policies. According to IMO, as of the end of 2010, TIG owed an additional $48 million in defense costs under those policies.

Transamerica's Agreements with TIG

Between 1976 and 1992, Transamerica entered into four agreements with TIG to indemnify TIG for its payments under the fronting policies. In 1992, Transamerica and TIG also entered into an agreement with regard to the pre-1972 direct policies pursuant to which Transamerica would contribute to TIG half the total amounts of defense and indemnity sought by IMO for asbestos litigation. The result of these agreements was that Transamerica actually paid approximately half the amounts paid by TIG to IMO under its direct and fronting policies.

Divestiture of IMO

In 1986, Transamerica divested IMO's predecessor by spinning off its shares to Transamerica shareholders, and the new company became IMO. The terms of the divestiture were contained in a Distribution Agreement dated December 18, 1986. On the subject of insurance coverage, the agreement stated:

> Section 6.02 Insurance  With respect to all insurance plans of [IMO], [IMO] shall be liable for payment of claims (to the extent not covered by Transamerica's Risk Management Program) arising out of incidents, known or unknown, reported or

A-6240-10T1

> unreported, which were incurred prior or
> subsequent to the Distribution Date.

> [(Emphasis added).]

A dispute on appeal pertains to the underscored language and the obligations, if any, it imposes upon Transamerica after the divestiture.

Asbestos Lawsuits, IFAs, and Exhaustion of Policies

At the time of the 1986 divestiture, IMO had been named as a third-party defendant in three asbestos liability lawsuits. IMO tendered these claims to TIG for indemnification and defense.  TIG provided one hundred percent of the funds to pay these claims, and Transamerica then reimbursed TIG at least half that amount pursuant to their agreements.  Many more asbestos claims were filed after the divestiture, and TIG continued to provide a defense to IMO under both its direct policies and its fronting policies.

In 1989, IMO sent "first notice" letters to excess insurers.  These letters made no demand for payment and provided minimal information about the claims against IMO or any underlying policies that might be in place.  In fact, according to the excess insurers, IMO told them it had ample primary insurance coverage and their policies were unlikely to be reached in the foreseeable future.

A-6240-10T1

In 1991, IMO discovered NJM's and Aetna's older primary insurance policies and tendered its asbestos claims to NJM and to Travelers Insurance Company ("Travelers") as successor to Aetna. Aetna's policies covered IMO from 1955 to 1964. On September 30, 1992, IMO entered into an Interim Defense and Indemnification Funding Agreement ("IFA") with TIG and Aetna/Travelers under which all defense costs were to be paid by TIG and Aetna, and indemnity payments were split in three equal shares among TIG, Aetna, and IMO.

NJM, on the other hand, did not acknowledge coverage on its primary liability policies issued to IMO from 1935 through 1954. IMO filed suit against NJM and was successful in compelling it to provide coverage. On March 24, 1993, IMO entered into an IFA with NJM, which applied in conjunction with the earlier IFA with TIG and Aetna/Travelers. Neither of the two IFAs was intended to be a final allocation of IMO's losses, and both reserved the parties' rights to seek reallocation of the amounts paid.

Under the two IFAs, defense costs were split equally among Aetna, NJM, and TIG, and indemnity costs were split equally among the three insurers and IMO. In 1998, NJM declared its policies exhausted, having paid $4,234,703 in defense and indemnity costs. It made no further payments after that time. When Aetna balked at continuing payments, IMO filed suit against

A-6240-10T1

Aetna and IMO's excess insurers seeking to compel payments under Aetna's IFA. IMO did not actively pursue the matter against the excess insurers, and in 2000 it voluntarily dismissed them from the litigation. A new sharing arrangement was reached among Aetna/Travelers, TIG, and IMO under which Aetna paid one fourth of defense costs and one fourth of indemnity costs, IMO paid one third of indemnity costs and none of the defense costs, and the balance of both types of costs was paid by TIG.

Aetna declared its policies exhausted in August 2003, having paid a total of $15,240,064. IMO did not challenge Aetna's declaration of exhaustion. TIG then continued making payments under the IFAs for several more months, paying one hundred percent of defense costs and two thirds of the indemnity costs. All of IMO's defense costs through the end of 2003 were paid by means of the IFAs, and IMO incurred no unreimbursed defense costs through that time.

In early 2004, when TIG declared its 1977 through 1986 fronting policy limits exhausted, TIG had paid a total of $30,856,193 to IMO as reimbursement of indemnity and defense costs, these payments being allocated by TIG to both its pre-1972 direct policies and to the 1977 through 1986 fronting policies.

Owens-Illinois and Carter-Wallace

The New Jersey Supreme Court's 1994 decision in <u>Owens-Illinois</u>, <u>supra</u>, 138 <u>N.J.</u> at 478-79, first established the "continuous trigger" theory of insurance coverage for long-tail environmental losses, such as exposure to asbestos. The Court defined the term "occurrence" in liability policies to mean a separate triggering event for insurance coverage in each year from the time a claimant alleging injury was first exposed to asbestos until manifestation of an asbestos-related disease or until insurance coverage became unavailable. <u>Ibid.</u> The Court also established a pro-rated model for the allocation of coverage responsibilities among multiple insurers based on an insurer's time on the loss and limits of risk coverage in the policies. <u>Id.</u> at 474-75.

In July 1998, the Court issued its decision in <u>Carter-Wallace</u>, <u>supra</u>, 154 <u>N.J.</u> 312, as further development of the allocation methodology. The Court held that excess insurers were included in the model, and that policies would be exhausted "vertically" in each year of coverage applicable to a claim rather than all primary insurance policies being exhausted "horizontally" first across the range of "triggered" coverage years before excess insurers' policies would attach. <u>Id.</u> at 325-28.

In November 1998, representatives from IMO, TIG, and Transamerica met and discussed applying the Carter-Wallace allocation methodology to IMO's claims. IMO's General Counsel strongly disagreed with Carter-Wallace and refused to apply its methodology to allocate responsibility among IMO's insurers. He was satisfied with the IFA arrangements in place where IMO paid a third of indemnity and no defense costs.

The Present Litigation

In 2002, IMO sought assurance from the Transamerica defendants that they would continue to pay full defense costs and most of the indemnity costs for asbestos claims. When assurance was not given, IMO filed its initial complaint in August 2003 against the Transamerica defendants.

In early 2004, the Transamerica defendants informed IMO that TIG's fronting policies were exhausted as of December 31, 2003. A February 4, 2004 letter written by counsel for Pyramid stated that, up to December 31, 2003, Transamerica had paid "at least $9,703,101 in indemnity for asbestos bodily injury claims, and at least $5,138,148 for expenses for those claims" and that those sums exceeded the amount of the SIRs and the limits of TIG's fronting policies. The letter informed IMO that any future payments for indemnity and expenses would be paid "by Pyramid's excess policies, up to the limits of the Pyramid

policies." Pyramid's future payments would be based on its Carter-Wallace allocation share after a short transitional period.

Although IMO eventually added the excess insurers to the present litigation, it initially told them in private meetings that it had done so to avoid inconsistent judgments if active litigation against the excess insurers were to become necessary in the future. IMO reassured the excess insurers that their policies were not going to be reached because the TIG "outside the limits" policies for 1977 through 1981 would never reach their limits of coverage.[3]

In July 2005, IMO appeared to waver in its belief that the TIG policies had not been exhausted. As a result, Pyramid agreed that its excess policies were triggered and advanced IMO $2 million toward defense invoices. In August 2005, however,

---

[3] According to TIG and some of the excess insurers, IMO originally took the position that the $1 million limits of the fronting policies would never be reached because each asbestos personal injury claim was a separate occurrence, and IMO's indemnification liability for those claims was a relatively small amount. No individual asbestos claim would exhaust the $1 million in indemnification coverage and TIG would perpetually have to provide defense costs on the "outside the limits" policies. As we will explain further, IMO and its expert presented a different version of their theory of "limitless defense costs" during this litigation that did not rely on a separate occurrence and $1 million dollars of indemnity coverage for each individual claim.

A-6240-10T1

IMO again asserted that the TIG policies had not been exhausted. Pyramid then stopped making payments.

On August 21, 2007, IMO wrote to excess insurers demanding that they pay IMO's asbestos losses in accordance with an allocation calculated by IMO's expert, Dr. Charles Mullin. In his trial testimony, Mullin reviewed his calculations and agreed that they indicated TIG's fronting policies should be allocated $13,349,296 in defense and indemnity costs. He subsequently adjusted that figure to $13,433,600.

Since making its August 2007 demand on excess insurers, IMO has settled with more than a dozen of them, with total policy limits of at least $708 million. Some of the excess insurers that did not settle and raise issues in this appeal have also paid millions of dollars to IMO under their policies.

On September 10, 2008, IMO produced a new allocation of losses and claimed that TIG and Transamerica owed millions more than the approximately $13.5 million calculated in Mullin's earlier allocations. IMO based this claim on TIG's continuing obligation to pay defense costs under the first five fronting policies until its actual payments of indemnification obligations, rather than allocation, reached the $1 million level of each policy. IMO claimed that allocation of losses to the fronting policies under the Carter-Wallace model was not

sufficient to reach their limits but actual payment had to be made by TIG in accordance with the language of those policies.

In this litigation, IMO has referred to this coverage position by several different names, including "bookend" and "limitless defense costs."  The Transamerica defendants refer to it as the "running spigot" theory of coverage under TIG's fronting policies of 1977 through 1981.  The crux of this theory is that, with defense costs being paid outside the policy limits, TIG's obligation to cover defense costs for claims that could be attributed to those policy years would continue until TIG actually paid $1 million in indemnity costs from the policy in each of those years.  With the small amount of indemnity payments on the liability that IMO has for injured plaintiffs in asbestos cases (many of those cases settling for only several thousand dollars from IMO), the limits of the TIG "outside the limits" policies would not be reached for many years.  TIG's obligation to continue paying for defense costs would continue indefinitely.

Pleadings and Pre-Trial Proceedings

IMO began this litigation with its first complaint and jury demand filed in August 2003 against only the Transamerica defendants.  It sought a declaration of rights and obligations under the TARM program and under the primary and excess

22                                                    A-6240-10T1

insurance policies issued by TIG and Pyramid. It also sought compensatory and punitive damages for breach of contract and related causes of action. Defendants filed answers, cross-claims, counterclaims, and a third-party complaint against three excess insurance carriers.

In 2004, IMO filed a second amended complaint, adding new claims against the Transamerica defendants and also naming numerous excess insurers as defendants. Over time in this litigation, most of the excess insurers either settled with IMO or were dismissed from the case. Twelve defendants remained in the case at the time of the trials beginning in 2009.

In the intervening time, the court entered orders holding that New Jersey law is applicable to certain pertinent issues, granting or denying summary judgment on various grounds, determining that the Carter-Wallace allocation methodology would be applied, and appointing a special allocation master ("SAM") to consider all allocation-related issues and to make recommendations to the trial judge.

In January 2009, Retired Judge Robert Muir, Jr., was recalled to the bench and assigned to the case. At about that time, Pyramid and TIG renewed motions they had filed earlier to strike plaintiff's jury demand and to proceed with a bench trial. On June 30, 2009, Judge Muir granted the motions and

23                                                                    A-6240-10T1

ordered that all issues would be tried without a jury.  This court and the Supreme Court denied IMO's motions for leave to appeal that ruling.

Bench Trials on Discrete Issues

In June 2009, Judge Muir tried the issues related to certain excess insurers in a four-day bench trial.  He issued a final decision and order on the excess insurers' coverage disputes on December 16, 2009.  Several excess insurers — including ACE, LMI, and Zurich American Insurance Company and its predecessors and affiliates ("Zurich") — have cross-appealed, challenging Judge Muir's December 2009 decision as well as other aspects of the final judgment entered two years later.

After the June 2009 bench trial, Judge Muir scheduled separate bench trials on two major issues.  At the Phase I trial conducted in the early months of 2010, the issue was whether the TIG fronting policies were in fact exhausted.  Judge Muir found by an oral decision on October 14, 2010, that the policies were not only exhausted by the end of 2003, but that TIG had overpaid its obligations.

In reaching that conclusion, Judge Muir found that IMO's allocation expert, Mullin, was not a credible witness and that IMO's "limitless defense costs" or "running spigot" theory was

not supported by the evidence or legal precedent. He determined that TIG had paid $9,655,200 in indemnity losses and $6,254,400 in defense costs, for a total of $15,909,600 paid under its fronting policies of 1977 through 1986 and also excess policies from 1972 through 1976. Since the judge's findings allocated $13,636,700 to IMO's defense costs and indemnification losses during that time period based on an allocation model prepared by the SAM, TIG had overpaid its obligations by $2,271,900. Judge Muir stated it would be inequitable and unconscionable to allow IMO to keep the overpayments, but he did not rule further with respect to disposition of TIG's overpayments, and did not reach any decision as to payments TIG had made under its pre-1972 direct policies.

At the Phase II trial held in the spring of 2010, Judge Muir considered the dispute between IMO and Transamerica. In his written decision issued on December 29, 2010, the judge found that IMO had failed to establish the existence of an implied-in-fact contract requiring Transamerica to continue reimbursing IMO for its SIRs and other unreimbursed costs of asbestos claims, and that the written Distribution Agreement controlling the 1986 divestiture of IMO is an unambiguous contract that governs the issues between IMO and Transamerica. The judge rejected IMO's assertion that Transamerica was IMO's

de facto insurer for its SIRs, deductibles, and other expenses, and he dismissed IMO's claims for breach of contract, estoppel, and bad faith.

Judge Muir completed his service on recall in January 2011 after issuing his decisions on the Phase I and Phase II trials. Retired Judge Donald Coburn was then assigned on recall to preside over the case.

Final Judgment

Following the Phase I trial, the SAM prepared a retroactive allocation of IMO's losses, which "ignored" payments by TIG and others in calculating the allocation figures and made no recommendations as to the treatment of overpayments by TIG that Judge Muir had found. Because the SAM's report attributed defense costs to TIG after 2003, it concluded that TIG still owed IMO almost $2 million under the fronting policies.

Judge Coburn directed the SAM to prepare a new loss allocation report that did not accept IMO's "running spigot" theory and took into account all payments made by TIG. The SAM's revised allocation schedule issued in April 2011 was based on total estimated costs to IMO of $325 million through the end of 2010. It allocated $15,232,832 to the TIG fronting policies under what TIG calls a "modified spigot" theory.

A-6240-10T1

In his ruling on the final loss allocation, Judge Coburn rejected parts of the SAM's revised allocation schedule as contrary to Judge Muir's Phase I decision. Applying Judge Muir's decision that TIG payments from policy years that were overpaid would be transferred to those years that were underpaid, Judge Coburn determined that all payments from TIG, including those previously attributed to the pre-1972 direct policies, could be transferred to determine if policies were exhausted under the proper Carter-Wallace allocation. He further found that the "running spigot" theory was not supported by IMO's own reasonable expectations when it procured the insurance policies, and that the allocation of additional defense costs to the fronting policies would be disproportionate to the degree of risk transferred to TIG under those policies.

Judge Coburn adjusted the SAM's calculation by reducing defense costs attributed to TIG by the amounts incurred after the TIG policies were exhausted. He allocated $8,165,364 in indemnity and $5,159,341 in defense costs to TIG's pre-1972 direct policies, a total of $13,324,705. He allocated $8,403,478 in indemnity and $5,342,606 in defense costs to TIG's fronting policies, a total of $13,746,084. By taking into account TIG's payments under the IFAs, which totaled $30,856,193, and also payments made by another insurer

affiliated with TIG, Judge Coburn determined that TIG had overpaid IMO $15,201,438, which he rounded off to $15,200,000.

Judge Coburn suggested that the parties discuss resolution of how that amount might be reimbursed to TIG by the excess insurers that had coverage obligations. The parties, however, were not able to resolve the issue. By final judgment dated August 16, 2011, the judge awarded $15,200,000 to TIG as money damages against IMO for TIG's overpayments on its policies, plus prejudgment interest of $1,400,000. Of the amount awarded to TIG, the judgment accounted for a total of $8,521,771 as sums paid or to be paid by ACE, LMI, and one other excess insurer to IMO, the balance being IMO's separate responsibility.

The final judgment also declared that Transamerica had no further obligation to IMO for its asbestos claims, and the excess insurers were ordered to pay their shares according to the allocation schedule adopted by the final judgment. The judgment also denied IMO's application for attorneys' fees and prejudgment interest and Transamerica's application for attorneys' fees under an indemnification provision of the 1986 Distribution Agreement. All remaining claims, counterclaims, and cross-claims that were not specifically addressed in the final judgment were dismissed with prejudice.

## II.

## Exhaustion of TIG's Fronting Policies

The lead issue in the case — the exhaustion issue — is whether TIG must cover defense costs for an endless or indefinite time until it has actually paid the indemnification limits of its policies, or whether those policies were exhausted and TIG has no further obligations to IMO.

IMO, some excess insurers, and amicus curiae Independent Energy Producers of New Jersey claim error in Judge Muir's exhaustion decision and its implementation by Judge Coburn in the final allocation judgment. They contend the judges failed to hold TIG liable for a continuing obligation to pay defense costs although the fronting policies from 1977 through 1981 require payment of defense costs "outside the limits" of the indemnification coverage.

The policies provide that the insurer will "not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements" (emphasis added). IMO argues that the policies unambiguously require exhaustion by formal payment, not just by allocation of sufficient losses to the policies.

Before we address this argument, we will review <u>Owens-Illinois</u>, <u>supra</u>, 138 <u>N.J.</u> 437, and some cases that followed it. <u>Owens-Illinois</u> is the seminal case in New Jersey setting forth the methodology for proportional allocation of indemnity and defense costs among multiple insurers in "long-tail" environmental exposure litigation. <u>Spaulding Composites Co. v. Aetna Cas. & Sur. Co.</u>, 176 <u>N.J.</u> 25, 39 (2003), <u>cert. denied sub nom.</u> <u>Liberty Mut. Ins. Co. v. Caldwell Trucking PRP Grp.</u>, 540 <u>U.S.</u> 1142, 124 <u>S. Ct.</u> 1061, 157 <u>L. Ed.</u> 2d 953 (2004).

The insurance policies in <u>Owens-Illinois</u> contained standard clauses providing liability coverage for bodily injury that "occur[ed]" within the policy period. <u>Owens-Illinois</u>, <u>supra</u>, 138 <u>N.J.</u> at 447. The Court explained that, where injuries were sustained over long periods of time, questions arise as to when and how liability insurance coverage of the allegedly responsible parties is triggered and as to how losses should be fairly allocated among the range of triggered policies. <u>Spaulding Composites</u>, <u>supra</u>, 176 <u>N.J.</u> at 32. The Court observed that rigid enforcement of the policy terms as governed by traditional principles of insurance law could not capture the time of an occurrence in the context of such toxic-tort litigation. <u>Owens-Illinois</u>, <u>supra</u>, 138 <u>N.J.</u> at 457-59. It concluded that "[m]ass-exposure toxic-tort cases have simply

exceeded the capacity of conventional models of judicial response." Id. at 459.

The Court reviewed a number of options to resolve the question of determining the "occurrence" of an injury that does not manifest for many years. It ultimately adopted a "continuous-trigger" theory by which an injury would trigger coverage continuously from the date of the claimant's first exposure to asbestos onward as a single "occurrence" for each year. Id. at 478-79. The Court then adopted a pro-rata allocation methodology, distributing the insured's losses for the triggered time period in percentage shares commensurate with the "degree of risk transferred or retained in each of the years of repeated exposure to injurious conditions." Id. at 475. The resulting allocation among insurance policies would thus be "related to both the time on the risk and the degree of risk assumed." Id. at 479. The insured would share in the allocation for periods where it voluntarily retained the risk rather than contracting for available insurance. Ibid. Policy limits and exclusions would remain applicable, and the resulting allocation would conform to the particulars of the policies at issue. Id. at 476.

The Court "recognize[d] the difficulties of apportioning costs with any scientific certainty," but accepted that a "rough

31

measure" of each insurer's proportionate allocation of losses might be the best that could be achieved.  Id. at 476-77.  The Court never independently addressed allocation of defense costs as opposed to indemnification for claims that the insured would have to pay to the injured person, though the undeniable implication of Owens-Illinois is that defense costs are also allocable, subject to policy terms, in the same manner as indemnity expenditures.

In Carter-Wallace, supra, 154 N.J. at 325-27, the Court confirmed the application of the continuous-trigger theory and pro-rata methodology in allocating liability among both primary and excess policies.  It rejected an argument made by the second-level excess insurer in that case that the insured party must exhaust all primary and first-level excess policies in the entire coverage block before accessing any second-level excess coverage.  Id. at 324.

The Court also rejected the insured's contention that the entire universe of losses should be collapsed to a single year so as to access immediately the coverage from all insurers for that one year.  Id. at 325.  Neither of these arguments was faithful to the holding of Owens-Illinois that ongoing injuries should be treated as a single occurrence within each year.  Consequently, the Court adopted an approach requiring that

losses first be allocated "horizontally" among the range of years in the coverage block, but that policies be exhausted "vertically" within each year, such that each successive layer of insurance within a given year would be accessed as the one below was exhausted. Id. at 327-28. The Court added:

> Our jurisprudence in this area has not been marked by rigid mathematical formulas, and we do not advocate any such inflexibility now. Rather, our focus remains on "[a] fair method of allocation . . . that is related to both the time on the risk and the degree of risk assumed." [Owens-Illinois, supra, 138 N.J.] at 479. Nevertheless, we anticipate that the principles of Owens-Illinois, as clarified by our decision today, represent the presumptive rule for resolving the allocation issue among primary and excess insurers in continuous trigger liability cases unless exceptional circumstances dictate application of a different standard.
>
> [Carter-Wallace, supra, 154 N.J. at 327-28.]

In Spaulding Composites, supra, 176 N.J. at 28, the Court considered whether application of a "non-cumulation" clause in a comprehensive general liability policy could be enforced consistently with the Owens-Illinois methodology. Such clauses "operate[] to limit an insurer's liability under multiple sequential . . . policies where losses related to a 'single occurrence' trigger the successive policies." Id. at 43-44 (emphasis added). The purpose of such clauses is to avoid the "'cumulation' of policy limits for damage arising out of [a]

single occurrence . . . ." Id. at 44. Because Owens-Illinois had explicitly rejected the theory that an injury in a long-term environmental exposure case constitutes one single occurrence, the Court held that non-cumulation clauses simply did not apply in that context. Ibid. It added:

> [E]ven if the non-cumulation clause was not facially inapplicable, we would not enforce it because it would thwart the Owens-Illinois pro-rata allocation modality. Once the court turns to pro rata allocation, it makes sense that the non-cumulation clause, which would allow the insurer to avoid its fair share of responsibility, drops out of the policy.
>
> [Ibid.]

Thus Spaulding Composites supports the proposition that the Owens-Illinois and Carter-Wallace allocation model supersedes contrary terms of an insurance policy.

The Court again affirmed the allocation model in Benjamin Moore & Co. v. Aetna Casualty & Surety Co., 179 N.J. 87, 91 (2004), but this time the Court adhered to the language of the policies where they did not conflict with the allocation model. In Benjamin Moore, the Court determined that an insured would have to satisfy its full per-occurrence deductibles for each policy before accessing indemnity coverage. In so doing, the Court clarified that:

> when a policy is triggered, so are its fundamental terms and conditions. Although

34                                                    A-6240-10T1

> Owens-Illinois did not turn on policy
> language or traditional interpretation rules
> because it was crafting an overarching
> scheme for solving the scientifically
> unsolvable problem of determining how to
> allocate progressive environmental damage to
> sequential policies, that scheme was
> nevertheless meant to be superimposed on the
> specific terms of insurance contracts. That
> is why the Owens-Illinois allocation
> methodology is subject to "limits and
> exclusions." In other words, Owens-Illinois
> was never intended to displace the basic
> provisions of the insurance contract so long
> as those provisions are not inconsistent
> with the underlying methodology specifically
> adopted in that case.
>
> [Id. at 101 (emphasis added and citations
> omitted).]

IMO argues this last-quoted explanation by the Court means

that the Owens-Illinois and Carter-Wallace allocation

methodology must be superimposed over the terms of TIG's

fronting policies rather than superseding those terms. If, as

IMO contends, the policies require that only actual payments for

IMO's losses can relieve TIG of its contractual obligation to

pay for defense costs, total coverage of IMO's losses and the

attachment point for excess insurers will be affected.

IMO and amicus curiae contend that Judge Coburn mistakenly

deemed the policy language requiring actual payment to be

ambiguous and inappropriately resolved that ambiguity in favor

of his own belief that a reasonable insured would never expect

coverage of defense costs far exceeding the indemnity limits of

a policy.  Judge Coburn commented that an insurer would pay its indemnification limit in full before incurring a much larger obligation to pay defense costs, but IMO and amicus curiae contend that case law prohibits an insurer that provided "outside the limits" defense coverage from avoiding its obligations by paying its indemnity limit and then abandoning the insured.  See, e.g., Chubb/Pacific Indem. Group v. Ins. Co. of N. Am., 233 Cal. Rptr. 539, 543 (Ct. App. 1987); Douglas v. Allied Am. Ins., 727 N.E.2d 376, 382 (Ill. App. Ct. 2000); Simmons v. Jeffords, 260 F. Supp. 641, 642 (E.D. Pa. 1966).

According to IMO and amicus curiae, many insureds actively seek and bargain for limitless coverage of litigation defense and related costs.  Amicus curiae cites examples in the federal courts to support its argument that such coverage may far exceed the limits of the indemnification obligation of the insurer.  See, e.g., Emhart Indus. v. Home Ins. Co., 515 F. Supp. 2d 228, 231, 257 (D.R.I. 2007), aff'd sub nom. Emhart Indus. v. Century Indem. Co., 559 F.3d 57 (1st Cir. 2009).

In his final allocation decision, Judge Coburn first noted that coverage for defense costs outside policy limits was provided in policies representing only $40.6 million of more than $1.85 billion of total coverage.  Consequently, the SAM's allocation schedule had "only used the indemnity amount of each

policy without attempting to include any value for those portions of policies that paid defense costs in addition to the face amount."  The parties agreed with this approach for the sake of efficiency since the difference in the allocation percentages would be negligible.

Judge Coburn disagreed with IMO that the policy language of TIG's "outside the limits" fronting policies unambiguously requires exhaustion by formal payment.  He stated he would construe that language consistently with Owens-Illinois and the reasonable expectations of the parties to permit exhaustion by allocation of indemnity losses rather than by actual payment of those losses.  Judge Coburn also adopted Judge Muir's conclusion that all of TIG's payments pursuant to the IFAs, whether or not reimbursed by Transamerica, would count to satisfy the limits of the fronting policies.  He agreed with Judge Muir that annual policy limits would be exhausted by crediting across coverage years payments that TIG had previously attributed to one policy year to a different underpaid policy year.  As a result of his calculations, Judge Coburn not only accepted Judge Muir's earlier conclusion that the fronting policies had been exhausted by the end of 2003, but he found that some of the "outside the limits" policies had been exhausted in 1999 and others in 2000.  IMO complains that not even TIG and Transamerica claimed that

37                                    A-6240-10T1

the fronting policies were exhausted earlier than the end of 2003.

IMO and amicus curiae also criticize Judge Coburn's statements that the expectations of the parties would not make sense if the obligation of TIG to pay defense costs far exceeded its obligation to provide indemnity coverage under any policy. They argue that many liability policies provide for coverage of litigation or defense expenses far beyond the indemnification limits of the policies, and courts have uniformly recognized the enforceability of such policy provisions. See Gen. Accident Ins. Co. of Am. v. Dep't of Envt'l Prot., 143 N.J. 462, 464 (1996) (using the term "cost-exclusive" policies to mean the same as our "outside the limits" policies).

We recognize that some of Judge Coburn's statements in his oral decision of May 24, 2011, if applied to other types of liability coverage, may deviate from the expectations of insureds who purchase "outside the limits" policies and pay premiums to cover all their litigation expenses. But Judge Coburn was not addressing a typical insurance claim for a single occurrence and a single insurance policy. He was deciding how the allocation model established in Owens-Illinois and Carter-Wallace should apply to long-tail claims, with many primary and excess policies covering years of loss, some of which did not

have defined limits of coverage for defense costs.  As Judge Coburn stated in his decision, "exhaustion may mean one thing in one context [and] it may mean another thing in another context."

To allay some of the fears expressed by amicus curiae, the exhaustion decision in this case is closely tied to its facts. We reach no general conclusion that an insurer's obligations to cover defense costs and other litigation expenses through an "outside the limits" policy is limited by the maximum amount of indemnification coverage provided in that policy.

In the context of crafting a fair though imprecise allocation model for long-tail claims, our Supreme Court has allowed that a policy term that is contrary to the model may "drop[] out of the policy."  Spaulding Composites, supra, 176 N.J. at 44.  It also suggested that policy terms that are "inconsistent with the underlying methodology specifically adopted in [Owens-Illinois]" may be displaced.  Benjamin Moore, supra, 179 N.J. at 101.  We find no legal error in the trial judges' interpretation of the "payment" provision of the "outside the limits" policies and their reliance on the supervening effect of the Owens-Illinois and Carter-Wallace allocation methodology.

Challenging the final allocation judgment on a separate ground, IMO argues that the payments from TIG that were not

reimbursed by Transamerica were paid out of the direct policies pre-dating 1972 and should not be attributed to the fronting policies from 1977 to 1986. According to IMO, Judge Coburn deviated from Judge Muir's decision in transferring payments across policy years, resulting in Judge Coburn's finding that TIG had overpaid its obligations by $15.2 million rather than the approximately $2.27 million that Judge Muir found.

Judge Muir's legal conclusion, however, was not as IMO claims. In responding to IMO's contention that TIG payments reimbursed by Transamerica should not be credited to TIG's allocations, Judge Muir concluded that Transamerica's payments were equally applicable for TIG's exhaustion purposes as were TIG's unreimbursed payments. He stated:

> [W]ho made the payments to IMO [was] irrelevant, just as it would be if TIG went out and borrowed money to make the payments. That the payments were made and were received by IMO as part of the Fronting Policy indemnity duty is the only issue of concern. I reject any adverse inferences IMO projects from the fact Transamerica made payments.

But Judge Muir did not limit the transfer of overpayments on TIG policies to the years that the fronting policies were in effect. The final allocation schedule adopted by the court showed some of TIG's policies individually overpaid and others individually underpaid. Judge Coburn carried forward to

A-6240-10T1

additional calculations Judge Muir's conclusion that overpaid years could be shifted to underpaid years and that IMO should not be permitted to retain the total overpayment once the allocation schedule was complete and the entirety of TIG's obligations was determined.

TIG's payments totaled more than $30 million. Although some of those payments are attributable to the pre-1972 direct policies, more than $15 million, according to Judge Muir's findings and more than $13 million according to Judge Coburn's findings based on a revised allocation schedule, were attributable to TIG's fronting policies. There is no dispute that TIG made payments that exceeded the aggregate of its <u>Owens-Illinois</u> and <u>Carter-Wallace</u> allocations. So, we can say its policies were exhausted not just by allocation, but by allocation combined with payments that exceeded the total amount allocated to TIG.

We also reject IMO's argument that such retrospective shifting of payments across coverage years violates the holding of <u>Carter-Wallace</u> that prohibits horizontal distribution of losses over several policy years. That holding pertains to a different question, whether all primary insurance policies over the range of coverage years have to be exhausted before the coverage obligations of any excess policies attach. <u>Carter-</u>

Wallace, supra, 154 N.J. at 324-25.  That holding is not applicable to the exhaustion decision in this case.

A contrary conclusion on shifting of payments among coverage years might provide an incentive for an insurer not to pay claims promptly on the chance that a future development in the law, or the discovery of additional policies and additional responsible insurers, results in a lesser obligation.  When TIG, acting alone or in conjunction with Aetna and NJM, paid for IMO's defense expenses in full under the IFAs through 2003, it did so without a concession that its payments were the correct amount of its allocated responsibility and without waiving a right to claim credits when a final allocation was determined.

As a result of Judge Muir's and Judge Coburn's decisions, defense costs are allocated to TIG's fronting policies in general conformity with the risks transferred to those policies. Once the indemnity limits of the fronting policies were reached by allocation, and the prior aggregate payments from TIG exceeded those allocations, TIG's coverage was exhausted.  The alternative, that TIG's responsibility for defense costs would remain open indefinitely, would contradict the mandate of Owens-Illinois requiring allocation proportionate to the risks transferred to the insurer.  The trial court correctly construed

the "payment" language in the "outside the limits" policies in the context of an Owens-Illinois and Carter-Wallace allocation.

IMO further contends that the trial judges ignored the insurers' contemporaneous conduct in performing their obligations under the policies. It contends that TIG and Transamerica made payments for seventeen years after the 1986 divestiture because they understood their obligations to do so under their contracts with IMO. We reject this argument, too.

It hinges on a spreadsheet prepared by a representative of Transamerica, which shows that the policies were overpaid in the aggregate but not all the individual fronting policies had sufficient losses allocated to exhaust them outright. Judge Muir rejected the probative value of the spreadsheet as both inaccurate in its figures and ultimately immaterial to an Owens-Illinois and Carter-Wallace allocation. We defer to the judge's rejection of that evidence as evaluated in the context of the full record. See Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-84 (1974).

TIG made payments in good faith pursuant to the IFAs. At the time of TIG's payments, allocation pursuant to Owens-Illinois and Carter-Wallace had not been mandated or was not attempted yet in this matter. The overpayments resulted from ongoing development of the law fixing the responsibilities of

the many insurers on the risk.  The fact that the timing of TIG's payments failed to coincide with loss allocations as calculated later was simply an accident of the development of the pertinent law.

It was also a product of IMO's refusal to allow a Carter-Wallace allocation at an earlier time to replace the IFAs.  If the court were to decrease IMO's and the excess insurers' liability for defense costs at TIG's expense, it would distort the parties' relative share of liability in a manner that does not accurately reflect the degree of risk each assumed.

In addition, IMO's "running spigot" theory contradicts the dictates of Owens-Illinois and would afford IMO an impermissible double recovery of some defense costs already borne by its primary insurers pursuant to the IFAs.  In this case, producing a proper allocation pursuant to Owens-Illinois and Carter-Wallace requires that the fronting policies be construed to have been exhausted by allocation and aggregate payment by TIG that exceeded the policy limits.

Finally, Transamerica and TIG offer as an alternative ground for affirmance of the exhaustion issue that IMO should be barred from raising its "running spigot" theory by the doctrine of unclean hands.  That doctrine permits the court to refuse equitable relief to a "wrongdoer with respect to the subject

matter of the suit," specifically where the party is "guilty of bad faith . . . in the underlying transaction." Pellitteri v. Pellitteri, 266 N.J. Super. 56, 65 (App. Div. 1993). Thus, a court may refuse to hear the wrongdoer's argument, even if otherwise meritorious, in the interest of equity and justice. Goodwin Motor Corp. v. Mercedes-Benz of N. Am., Inc., 172 N.J. Super. 263, 271 (App. Div. 1980). Application of the doctrine lies within the trial court's discretion. Pellitteri, supra, 266 N.J. Super. at 65.

Because IMO had previously insisted that TIG adhere to its obligations under the IFAs rather than determine its obligations pursuant to the Carter-Wallace methodology, Judge Muir invoked the doctrine of unclean hands to bar IMO from contesting the shifting of overpayments to TIG's underpaid policies when IMO pursued a Carter-Wallace allocation in this litigation. The judge stated IMO could not reverse course after it filed suit and take the position that the IFA payments were voluntarily made by TIG and Transamerica and could not be used as credits for underpaid years. We agree with the Transamerica defendants that the unclean hands doctrine also supports affirmance of Judge Muir's exhaustion decision.

In sum, Judge Muir correctly determined that payments by or on behalf of a single insurer could be shifted from one policy

year to another to determine exhaustion, and that the TIG fronting policies were exhausted by the end of 2003. In addition, Judge Coburn's final judgment, which deemed the fronting policies exhausted by allocation rather than by payment on specific policies, was consistent with the dictates of <u>Owens-Illinois</u>.

III.

A.

<u>Coverage Limits of Multi-Year Policies</u>

On cross-appeals, ACE, LMI, and TIG allege error in the treatment of multi-year policies in the allocation schedule. They contend that the plain language of their multi-year policies mandates that a single coverage limit for the entire term of the policy should have been used in the allocation schedule rather than the full coverage limit for each year the policy was in effect. They contend there was no basis for relying on extrinsic evidence to interpret the policies, and the trial court's acceptance of annualized application of the coverage limits results in multiplying the coverage that IMO purchased by the number of years the policies were in effect.

<u>ACE and LMI Multi-Year Policies</u>

ACE and LMI challenge Judge Muir's adoption of the SAM's ruling imposing annual <u>occurrence</u> limits on their multi-year

46

excess policies. ACE contends that policies it issued for November 1, 1959, to May 1, 1961; for January 1, 1974, to January 1, 1977; and for September 1, 1974, to January 1, 1977, provide a single per-occurrence limit for the duration of each policy. LMI similarly contends that its multi-year policies issued during 1967 to 1976 contain single per-occurrence limits. The language addressing the limits of liability differs among the policies, but each establishes a liability limit for each occurrence (or accident) and sets forth an aggregate limit for each annual period.

IMO does not dispute that the plain language of the policies would impose per-occurrence limits on a term rather than annual basis, but it sought a blanket ruling that every year of a multi-year policy should be treated as if a separate annual limit is available for asbestos claims.

The SAM noted that Owens-Illinois did not resolve this issue and that the Supreme Court granted discretion to the master appointed by the trial court to develop a formula that fairly reflects the risks transferred to insurers or assumed by the insured. He reviewed the holdings of Spaulding Composites, supra, 176 N.J. at 25; Benjamin Moore, supra, 179 N.J. at 87; and Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Surety Co., 978 F. Supp. 589, 608 (D.N.J. 1997), aff'd in part, rev'd

47                                                          A-6240-10T1

in part, 177 F.3d 210 (3d Cir. 1999), and concluded that it would be appropriate to attribute a separate occurrence to each year of a multi-year policy.

On November 18, 2009, Judge Muir affirmed the SAM's recommendation in a written opinion and conforming order.  The judge observed:

> Owens-Illinois undergirded its methodology with the premise that when progressive indivisible injury results from exposure to injurious conditions courts may reasonably treat the progressive injury "as an occurrence within each of the years of a [comprehensive general liability] policy." [138 N.J. at 478.]  The single occurrence for multi-year CGL policies contravenes that premise and accordingly is unenforceable.

We agree and affirm the judge's decision.

First, we note that the cases upon which ACE and LMI rely, Diamond Shamrock Chemical Co. v. Aetna Casualty & Surety Co., 258 N.J. Super. 167 (App. Div. 1992), certif. denied, 134 N.J. 481 (1993), and two unpublished decisions of this court, are not on point.  Diamond Shamrock predates Owens-Illinois and was decided under the laws of New York.  Id. at 222-23.  As to the other cases, in addition to being unpublished opinions with no precedential value, R. 1:36-3, they were also decided under the laws of other states.  These cases do not answer the question of whether provisions in policies that apply a single occurrence

limit over multi-year terms contravene the dictates of Owens-Illinois.

In Chemical Leaman, supra, 978 F. Supp. at 607-08, the United States District Court for the District of New Jersey applied Owens-Illinois to the question of multi-year occurrence limits. The court stated that the proper construction of Owens-Illinois was to "direct treatment of progressive property damage as distinct occurrences triggering per-occurrence limits in each year of a policy." Id. at 607. It noted that a precedential California case, Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co., 26 Cal. Rptr. 2d 35 (Ct. App. 1993), review granted and opinion superseded sub nom. In re Asbestos Insurance Coverage Cases, 866 P.2d 1311 (Cal. 1994), was discussed favorably in Owens-Illinois, supra, 138 N.J. at 451, 455, 475. The United States District Court quoted Armstrong World Industries as follows with regard to the proper allocation method for multi-year policies:

> "This Court finds that the most equitable
> method of allocation is proration on the
> basis of policy limits, multiplied by years
> of coverage. This method is consistent with
> the policy language in that it takes policy
> limits into consideration . . . This method
> also reflects the fact that higher premiums
> are generally paid for higher 'per person'
> or 'per occurrence' limits. Since some
> policies are in effect for more than one
> year, and injury occurs during every year
> from first exposure until death . . .

> [m]ultiplying the policy limits by years of coverage results in a more equitable allocation than proration based on policy limits alone."
>
> [Chemical Leaman, supra, 978 F. Supp. at 607-08 (emphasis added) (quoting Armstrong World Industries, supra, 26 Cal. Rptr. 2d at 57).]

The District Court understood "occurrence" in these cases to mean "discrete and separate injury in every year." Id. at 608. It agreed with the commentary in Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 9.04 (7th ed. 1994), that the decision of the California court in Armstrong World Industries supports payment of per-occurrence limits for each year of a multi-year policy. Chemical Leaman, supra, 978 F. Supp. at 608. Accordingly, it found that the insurance policies at issue in that case with terms greater than one year were "liable up to their respective per-occurrence limits for a separate occurrence during each triggered policy year in which they were on the risk." Ibid.

We implicitly endorsed the holding of Chemical Leaman in United States Mineral Products Co. v. American Insurance Co., 348 N.J. Super. 526, 545-46 (App. Div. 2002), a case that pertained to the issue of policy extensions, not multi-year policies. Id. at 529. More generally, we stated, "[I]t is clear that underpinning the [Supreme] Court's allocation method

is acceptance of the proposition that losses in an environmental damages case must be treated as an occurrence in <u>each</u> of the periods covered by a comprehensive general liability policy." <u>Id.</u> at 550.

Were it not for the pro-rata methodology adopted in <u>Owens-Illinois</u>, each asbestos claim filed against IMO that triggered the ACE and LMI policies would be treated as a separate occurrence subject to the per-occurrence limit for the entire multi-year terms of the policies.  The aggregate limits of the policies would control the insurers' total liability on the claims.  <u>Owens-Illinois</u> changed the ground rules and classified all asbestos claims made in a year as a single occurrence.  If all three years were to be viewed as a single occurrence, the insured would be deprived of the annual aggregate limits of the policies.  Because the imposition of per-occurrence limits in multi-year policies contravenes the goals of the pro-rata methodology established in <u>Owens-Illinois</u>, such limits are unenforceable as specifically written.

Judge Muir's decision adopting annualized application of the per-occurrence limits of the ACE and LMI multi-year policies is a fairer allocation of the risks transferred and assumed by those policies.

TIG Multi-Year Policy

     TIG challenges the grant of summary judgment to IMO as to
the proper interpretation of a three-year policy it issued in
the 1960s.  Specifically, TIG contends that the $2.5-million
aggregate limit for bodily injury liability should have been
applied for the full three-year period, not separately for each
policy year.

     IMO initially presented the issue to the special discovery
master ("SDM") appointed for this litigation, a different
individual from the SAM.  The SDM ruled that the policy language
was ambiguous in regard to an annual aggregate limit or a single
limit for the entire three-year period of the policy.  He
further ruled that the only available extrinsic evidence bearing
on the policy's interpretation was so one-sided in favor of
IMO's position as to justify the conclusion that the $2.5
million aggregate limit applied separately in each policy year.
The trial court subsequently adopted the SDM's ruling.

     The relevant facts are that TIG issued a policy that ran
from July 1, 1967, to July 1, 1970.  The policy provided bodily
injury coverage under its Coverage A designation and property
damage coverage under its Coverage B designation.  The
declarations page described Coverage A as having an aggregate
products liability limit of $2.5 million and Coverage B as

having limits of $500,000 each for aggregate products, operations, protective, and contractual liabilities.

Section 6 of the policy, which addressed products liability Coverages A and B, provided that, "[s]ubject to the limit of liability with respect to 'each occurrence' the limits of bodily injury liability and property damage liability stated in the Declarations as 'aggregate products' are respectively the total limits of the Company's liability for all damages arising out of the products hazard." Section 7, which addressed operations, protective, and contractual liability under Coverage B, used similar language to delineate the boundaries of those coverages, but explicitly added in a final, isolated sentence that "[a]ggregate limits of liability as stated in the Declarations shall apply <u>separately to each annual period</u>" (emphasis added). IMO argues that this last-quoted provision creates an ambiguity and that TIG's own representatives treated the $2.5 million limit as applying annually rather than as a total limit for all three years of the policy.

In response, TIG cites <u>Chubb Custom Insurance Co. v. Prudential Insurance Company of America</u>, 195 <u>N.J.</u> 231, 238 (2008), among other case law, and argues there is no ambiguity in the policy and thus the court may not resort to extrinsic evidence to interpret it. TIG contends Section 6 of the policy

A-6240-10T1

is applicable to coverage for bodily injury claims arising out of exposure to asbestos and that section's silence with respect to annual coverage limits, together with Section 7's explicit provision for separate annual limits for property damage, is clear policy language that can only be interpreted to limit the policy's total aggregate limit for the three years to $2.5 million. According to TIG, the trial court's unwarranted interpretation increased the aggregate limit to $7.5 million.

There is support in the case law for TIG's argument that a multi-year policy should not be interpreted as having annual coverage limits unless the language of the policy provides such limits. See Diamond Shamrock, supra, 258 N.J. Super. at 224-25; CSX Transp., Inc. v. Commercial Union Ins. Co., 82 F.3d 478, 483 (D.C. Cir. 1996); Soc'y of the Roman Catholic Church of the Diocese of Lafayette & Lake Charles, Inc. v. Interstate Fire & Cas. Co., 26 F.3d 1359, 1366 (5th Cir. 1994); Hercules, Inc. v. AIU Ins. Co., 784 A.2d 481, 495-96 (Del. 2001). But, again, these cases were not applying the Owens-Illinois and Carter-Wallace allocation methodology.

We do not find legal error in the SDM's and the trial court's conclusion that the policy at issue here was sufficiently ambiguous that resort to extrinsic evidence should be employed to interpret it. The representatives of TIG who had

responsibility for implementing the policy invariably applied an annual $2.5 million aggregate limit in their handling of pertinent claims and in other communications.

TIG argues that the actions of those employees were not relevant to interpreting the policy because they were not involved in drafting or issuing the policy in 1967.  They were administering the terms of the policy some thirty years later without ever having reviewed the clear limitations language of the policy.  The limitations language of the policy, however, is not as clear as TIG claims, and TIG had no witness to contradict the interpretation that its own representatives placed on the multi-year policy.

We do not find reversible error in the trial court's ruling.  The court's application of an annual aggregate limit for bodily injury to each year of TIG's multi-year policy was consistent with the <u>Owens-Illinois</u> and <u>Carter-Wallace</u> allocation methodology, and we will not disturb that ruling on appeal.

B.

<u>"Stub Policies" (Partial-Year Coverage)</u>

The ACE defendants claim that the coverage limit of a "stub policy," that is, a policy issued or extended for only part of a year, should be pro-rated.  They assert that assigning the full policy limit for purposes of the <u>Owens-Illinois</u> and <u>Carter-</u>

55                                    A-6240-10T1

Wallace methodology unfairly allows the insured to increase the liability limits for which it paid a premium. We disagree.

An ACE policy in effect from February 13, 1976, to January 1, 1977, provides umbrella liability coverage to a limit of $1 million for each occurrence, and $1 million annual aggregate. ACE contends its coverage limit should be pro-rated to reflect the time on the risk, which would be eleven-twelfths (or 0.9167) of $1 million.

The SAM found that policies issued or extended for a term of less than one year should be treated for purposes of the allocation as having a separate annual aggregate limit that will be in place for the term of the shortened policy period. Judge Muir adopted the SAM's report and recommendation.

In United States Mineral Products, supra, 348 N.J. Super. at 536-37, we reasoned that an insured who paid a pro-rated premium for an additional two weeks of coverage on an excess policy identical to that provided by the initial policy would expect that such a premium reflected only the insurer's reduced time on the risk, not a reduction of the policy's aggregate limits. We concluded that the stub policy created an additional set of aggregate limits that were available to the insured for the term of the policy. Id. at 550. Treating a stub policy as providing a pro-rated limit would result in the loss allocated

to the policy being reduced twice, once by its time on the risk and a second time by the pro-rating of the policy limit.

Our holding in United States Mineral Products is clear. If the annual aggregate limits of a stub policy are to be pro-rated, specific language in the policy must so provide. Id. at 559. Nothing in the ACE policy indicates that the annual aggregate limits are pro-rated.

Judge Muir did not err in attributing the full policy limit to the ACE policy for the period of time it insured the risk.

C.

### SIRs as Outside the Limits of Policies

ACE contends that the trial court erred in determining that IMO's payment of its SIR obligations was outside the coverage limits of ACE policies.

ACE issued two excess umbrella policies to Transamerica and its subsidiaries, which were in effect from January 1, 1976, through April 1, 1979. They provided a $1,000,000 limit of coverage, and also stated:

> $500,000 Combined Annual Aggregate That
> Would Otherwise Be Recoverable Hereunder
> Shall Be Retained by the Insured in Addition
> to the Underlying Set Forth Above.

ACE sought a ruling that the limits of the policies were eroded by IMO's retention of $500,000. The SAM issued a written report and recommendation concluding that the $1 million annual

limits are not eroded by the retention.  He noted that "[i]t is long standing custom and practice in the insurance industry to distinguish between deductibles and self insured retentions." While the limits of a policy are reduced by a deductible, they remain intact in the case of a self-insured retention.  The SAM rejected ACE's argument that the phrase "that would otherwise be recoverable" as quoted from the policy demonstrated an intention that the $500,000 "retention" would be deducted from the coverage limits.

The SAM also observed that ACE's position was weakened by its past course of conduct.  It had paid its full $1 million limit for claims occurring during the 1977-78 policy period. Moreover, an ACE claims adjuster stated in a 1980 status report that the policy limits were "in excess of a self insured retention of the insured of $500,000 each occurrence plus an annual aggregate of an additional $500,000 which can be utilized only once per year."  The SAM found that the adjustor's "interpretation of the clause is entirely logical and consistent with the reading of the endorsements whereby the word 'retained' is given the standard meaning denoting a self insured retention, as commonly understood in the insurance industry."

Judge Muir adopted the SAM's ruling and denied ACE's motion for summary judgment with respect to this issue.  The final

judgment allocated a total of $1 million each to the two ACE policies.

Although the SAM found that the distinction between a deductible and a SIR is "black letter insurance law," the issue appears not to have been directly addressed by a New Jersey court. In fact, we have in the past observed that "[o]ur courts appear to have used the terms self-insured retention and deductible interchangeably." Moore v. Nayer, 321 N.J. Super. 419, 438-39 (App. Div. 1999), appeal dismissed, 164 N.J. 187 (2000). However, because Moore was addressing co-insurance and did not consider the effect of deductibles or SIRs on policy limits, it is not controlling on this issue.

New Jersey courts have recognized that an insured's deductible erodes the policy limits. See Benjamin Moore, supra, 179 N.J. at 105-06; cf. Am. Nurses Ass'n v. Passaic Gen. Hosp., 98 N.J. 83, 88-89 (1984) (explaining why a deductible does not constitute "other insurance"). On the other hand, federal courts have stated clearly that a SIR does not reduce the limits of an insurance policy. In In re September 11th Liability Insurance Coverage Cases, 333 F. Supp. 2d 111, 124 n.7 (S.D.N.Y. 2003), the United States District Court explained the distinction between SIRs and deductibles:

> A SIR differs from a deductible in that a
> SIR is an amount that an insured retains and

> covers before insurance coverage begins to
> apply.  Once a SIR is satisfied, the insurer
> is then liable for amounts exceeding the
> retention, less any agreed deductible.
> Barry R. Ostrager & Thomas R. Newman,
> <u>Handbook on Insurance Coverage Disputes</u>
> § 13.13[a] (12th ed. vol.2, 2004). . . .
> In contrast, a deductible is an amount that
> an insurer subtracts from a policy amount,
> reducing the amount of insurance.  With a
> deductible, the insurer has the liability
> and defense risk from the beginning and then
> deducts the deductible amount from the
> insured coverage.
>
> [<u>Ibid.</u> (citation omitted).]

See also <u>Rite Aid Corp. v. Liberty Mut. Fire Ins. Co.</u>, 414 <u>F. Supp.</u> 2d 508, 517 (M.D. Pa. 2005) (a SIR transforms a primary policy into an excess policy covering amounts in excess of the SIR); <u>Gen. Star Nat'l Ins. Corp. v. World Oil Co.</u>, 973 <u>F. Supp.</u> 943, 949 (C.D. Cal. 1997) (same); Jeffrey E. Thomas & Aviva Abramovsky, 4 <u>New Appleman on Insurance Law</u> § 31.02[7][d] (2012) (once a SIR is satisfied the insurer is liable for amounts exceeding the retention less any agreed deductible).

Here, the $500,000 "retained by the insured" would reduce the coverage limit from $1 million if it is a deductible, but leave the $1 million intact if it is a SIR.  In the policies, the $500,000 is described as an amount to be <u>retained</u> by the insured.  The word "deductible" appears nowhere in the relevant provisions.  The endorsements also use the specific terms "retained" and "retention."  "[T]he words of an insurance policy

should be given their ordinary meaning . . . ."  Longobardi v. Chubb Ins. Co. of N.J., 121 N.J. 530, 537 (1990).  The more general phrase "otherwise recoverable" does not change the meaning of the words used in the policies to mean deductible.

As to ACE's argument that the SAM should not have considered extrinsic evidence of the parties' intent, that ground for the SAM's ruling was included as a secondary rationale.  Moreover, the conduct of the parties does provide an important source for deriving their intent as to the meaning of an insurance contract.  Am. Home Prods. Corp. v. Liberty Mut. Ins. Co., 565 F. Supp. 1485, 1503 (S.D.N.Y. 1983), aff'd as modified, 748 F.2d 760 (2d Cir. 1984).

The assignment of $1 million limits to the subject ACE policies was not error in the allocation schedule.

IV.

A.

Allocation Preceding Coverage Determinations

ACE and LMI, joined by other excess insurers, challenge Judge Muir's decision at the 2009 excess insurers' trial that coverage issues would not be re-litigated for each individual asbestos claim.  Judge Muir relied on language in Owens-Illinois, supra, 138 N.J. at 477, prohibiting the insurers in that case from re-litigating already-settled claims after

refusing to defend them.  We agree with that decision.  Allowing excess insurers to contest coverage is not feasible for long-tail, multi-claim coverage cases and would compromise the allocation methodology mandated by the Supreme Court.

Ordinarily, the insured "bears the burden of establishing that a claim lies within [a] policy's scope of coverage." Shaler ex rel. Shaler v. Toms River Obstetrics & Gynecology Assocs., 383 N.J. Super. 650, 662 (App. Div.), certif. denied, 187 N.J. 82 (2006).  ACE and LMI argued from the outset that IMO must satisfy its burden of establishing that claims it had paid were covered under the terms of the ACE and LMI policies.

Judge Muir first observed that IMO and the insurers that had participated in its defense had adopted reasonable procedures for settling only claims for which IMO potentially faced liability.  At the time of that observation, about 75,000 asbestos-related claims had been filed against IMO, of which IMO had settled approximately 15,000 and obtained dismissal of about 30,000.  IMO began to notify the excess insurers of the claims in 1989 and offered to make its claim files available to them for inspection.  Meanwhile, the excess insurers declined to involve themselves in defense of the claims.  They chose their course of action although they had the right, explicitly stated in their policies, to associate in the defense.  Judge Muir

considered this "continuing indifference" to be "tantamount to a refusal [by the excess insurers] to involve themselves in presented-claims defense."

A primary insurer that refuses its obligation to defend claims against its insured without first timely challenging coverage forfeits the right to hold an insured to that burden at a later time. Griggs v. Bertram, 88 N.J. 347, 363-64 (1982). Excess insurers, on the other hand, generally have no duty to participate in the defense and may rely on the good faith of the primary insurer in settling claims against the insured. CNA Ins. Co. v. Selective Ins. Co., 354 N.J. Super. 369, 383-84 (App. Div. 2002).

In Owens-Illinois, supra, 138 N.J. at 477, the Court distinguished long-tail coverage cases from the norm in the insured's burden of proving coverage for each claim. It stated:

> Because the defendants refused to involve themselves in the defense of the claims as presented, they should be bound by the facts set forth in plaintiff's own records with respect to the dates of exposure and with respect to the amounts of settlements and defense costs. Those losses for indemnity and defense costs should be allocated promptly among the companies in accordance with the mathematical model developed, subject to policy limits and exclusions. We stress that there can be no relitigation of those settled claims.
>
> [(Citation omitted and emphasis added).]

Judge Muir understood this last directive of the Court as applying with equal force to primary and excess insurers to bar them from contesting coverage of claims. He stated that Owens-Illinois was a watershed decision delineating "the response required of excess insurers to their insureds' liability for asbestos related injuries sustained over decades," and, moreover, that it was a "critical point that divides past case law principles from its doctrines."

Applying the language used by the Supreme Court in Owens-Illinois, Judge Muir concluded that where insurers, primary or excess, "refused" to avail themselves of the right to associate in defense of claims against the insured, they "should be bound by facts set forth in the insureds' records with respect to amounts of settlements and defense costs" and could not otherwise "relitigate the settled claims."

ACE and LMI contend they have a right as excess insurers but no affirmative duty to associate in IMO's defense. They add that Owens-Illinois neither imposed any such duty nor otherwise limited the right of excess insurers to demand that their insured bear its normal burden of establishing coverage for each claim made against their policies.

As this court's underlying opinion in Owens-Illinois noted, both primary and excess policies were involved in that case.

Owens-Illinois, Inc. v. United Ins. Co., 264 N.J. Super. 460, 467, 477 (App. Div. 1993), rev'd in part, 138 N.J. 437 (1994). The Supreme Court did not explicitly condition its directive prohibiting re-litigation of coverage issues to the primary insurers' affirmative duty to defend.  Rather, the Court stated: "In future cases, insurers aware of their responsibility under the continuing-trigger theory might minimize their costs by assuming responsibility for or involving themselves in the defense of the actions . . . ."  Owens-Illinois, supra, 138 N.J. at 478 (emphasis added).

It stands to reason that accommodating a challenge to coverage in tens of thousands of individual claims would not only prove daunting but would compromise the integrity of the framework Owens-Illinois offers for efficient and equitable allocation of losses among policies.  As we have stated, policy terms and traditional principles applicable to ordinary coverage litigation must bend insofar as they conflict with application of the Owens-Illinois framework.  Benjamin Moore, supra, 179 N.J. at 104.  The Court could thus impose a greater obligation on the part of excess insurers than specifically stated in their policies to participate in the insured's defense, or risk losing the right to challenge coverage decisions.

A-6240-10T1

Nor is our conclusion inequitable. IMO put the excess insurers on notice of the thousands of claims against it, and Owens-Illinois put them on notice of the necessity of participating in order to preserve their right to challenge coverage determinations.

The trial court appropriately gave effect to a plainly stated directive of Owens-Illinois — that insurers who have declined to associate in the defense of claims against the insured may be precluded from later challenging coverage.

B.

### Duty to Defend Uncovered Claims

ACE argues that the court erred in determining that defense costs incurred by IMO in connection with uncovered asbestos claims are recoverable under policies that limit defense reimbursement to costs paid as a consequence of a covered occurrence. ACE contends the majority of its policies are ultimate net loss policies that only obligate it to indemnify IMO where IMO itself becomes obligated by adjudication or compromise to pay for a covered occurrence. Relying on case law from other jurisdictions, ACE maintains that courts interpreting similar policy language have held that the duty to indemnify defense costs arises only when the costs are incurred in connection with covered claims.

LMI advances the same argument, although its policies differ from the ACE policies. However, both excess insurers' policies use the same definition of ultimate net loss. LMI argues that the ultimate net loss provision makes the existence of an actually covered claim, and not just a potentially covered claim, a prerequisite for indemnification of defense costs. It asserts that requiring IMO to segregate defense costs and to identify those utilized for actually covered claims would have no impact on the allocation process, and it would not be overly difficult to apportion defense costs after the allocation is completed.

IMO responds that the excess insurers' policies promise to pay for the costs of defending liabilities arising from covered "occurrences," not covered "claims." It emphasizes that Owens-Illinois defines an "occurrence" to be the decision to manufacture asbestos-containing products, not the exposure of a specific claimant to an asbestos product.

IMO further asserts that the excess insurers have relied on cases that are not pertinent to the proper definition of occurrence, and that the differences between the law of New Jersey and the law of New York and other states as to the nature of a covered occurrence distinguish the holdings of the case law cited by ACE and LMI. IMO argues that the trial court's refusal

to parse defense costs between covered and uncovered claims accords with the realities of defending mass tort claims, where the effective defense of meritless claims is part and parcel of the defense of covered claims.

A representative provision of the many policies involved provides that the insurer will indemnify the insured:

> for all sums which the [in]sured shall <u>be obligated to pay</u> by reason of the liability: (a) imposed upon the [in]sured by law, or (b) assumed under contract or agreement . . . for damages on account of: (i) Personal Injuries . . . caused by or arising out of each occurrence . . . as defined in the Underlying Umbrella Policies . . . .
>
> [(Emphasis added).]

A representative underlying policy covers damages and expenses for the insured's "ultimate net loss," which it defines as:

> the total sum which the insured, or any company as his insurer, or both <u>becomes obligated to pay</u> by reason of personal injury . . . either through adjudication or compromise . . . expense for . . . lawyers . . . and investigators and other persons and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder . . . .
>
> [(Emphasis added).]

The excess insurers argue that the phrase "be [or becomes] obligated to pay" absolves them of paying for defending against claims that are dismissed or adjudicated to be without merit.

In a written report and recommendation dated March 27, 2008, the SAM ruled that "[t]he common straightforward reading of the language is that indemnification for defense related expenses must be related to an occurrence. If there is no occurrence then there can be no covered damages." He observed that New Jersey law defines the occurrence as IMO's decision to sell asbestos products, and concluded that all of IMO's defense expenses flow from that decision. He therefore recommended that the court deny the excess insurers' motion and find that IMO is entitled to receive indemnity for all its defense expenses.

On the request of LMI and ACE for reconsideration, the SAM noted: "Mass-tort asbestos claims are defended very differently from the average claims," and some defendants choose to try questionable cases to a conclusion in order to send a deterrent message to the plaintiffs' bar. He also noted that applying LMI's and ACE's interpretation of an occurrence to each individual claim would present a significant practical challenge, in that it would impose an unworkable burden on IMO and require the expenditure of substantial judicial resources. He added:

> It is extremely difficult to see how adjudicating LMI's policies' provision to indemnify defense costs for only covered claims would not hijack the allocation process. While IMO should be required to demonstrate that a claim does fall within a

> given policy year, to require an evidentiary
> process on thousands of claims to determine
> their linkage to defense costs would be
> unworkable and unmanageable.  It would seem
> extremely difficult to connect every defense
> payment to a claim and to make a second
> determination that the claim is, indeed, a
> covered claim.

Judge Muir adopted the SAM's reasoning and ruling by an order dated November 4, 2009.

Both the excess policies and the underlying policies obligate the insurers to pay for damages arising out of an "occurrence."  In Owens-Illinois, supra, 138 N.J. at 447, where the insurers' policies had coverage and ultimate net loss provisions virtually identical to those in this case, the Court recited our conclusion that the manufacture and sale of the asbestos-containing product should be regarded as the single occurrence triggering liability for asbestos-related injuries or damage.  Id. at 445-46 (citing Owens-Illinois, supra, 264 N.J. Super. at 503).  Our opinion, in turn, had relied on the reasoning of the District Court in Owens-Illinois, Inc. v. Aetna Casualty & Surety Co., 597 F. Supp. 1515, 1525 (D.D.C. 1984), which held that "the number of injuries or claims, even if temporally removed from their causes, are irrelevant when determining the number of occurrences."  See also In re Integrity Ins. Co., 214 N.J. 51, 69-70 (2013) (the majority of courts have adopted a "cause test" for defining "occurrences");

U.S. Mineral Prods., supra, 348 N.J. Super. at 542 (manufacture and sale of asbestos-containing product constitutes single occurrence triggering liability).

The same result must follow here in the context of proving coverage for each individual claimant. The excess insurers' obligation to cover IMO's ultimate net losses, which include defense costs, was triggered when IMO manufactured and sold asbestos-containing products and claimants became injured by those products. IMO's decision to trade in such products resulted in IMO paying damages to claimants following litigation or settlement. Under the terms of the excess insurance policies, LMI and ACE are required to indemnify IMO for the sums it expended in defending all those claims.

The conclusion that the excess insurers must reimburse IMO for defense costs even if some of them were incurred to defend uncovered claims is also compelled by another aspect of Owens-Illinois. As the SAM noted, the need to segregate and classify defense costs according to each individual claim would greatly complicate the already complex allocation process. Challenges among the parties as to whether particular claims were covered or uncovered would increase litigation and require additional judicial attention. The reason the Court developed the pro-rata methodology was to reduce the litigation costs and judicial

71                                                                    A-6240-10T1

inefficiencies attendant to resolving insurance coverage for long-term environmental damages. <u>Owens-Illinois</u>, <u>supra</u>, 138 <u>N.J.</u> at 474. Adopting the process that the excess insurers suggest would directly contravene those objectives.

The unpublished and out-of-state decisions cited by the excess insurers are not controlling. None of them applies an analysis based on the principles articulated in <u>Owens-Illinois</u>.

We affirm the trial court's ruling that defense costs are subject to allocation even if a portion of them ultimately were devoted to defending against claims that were determined not to be covered under the insurance policies.

V.

## Denial of Jury Trial

IMO contends that the court erred in denying its demand for a jury trial on the legal issues in the case for which it sought money damages. More specifically, IMO argues that the court improperly relied on the relief sought in IMO's original complaint. It further argues that claims for future costs did not predominate the Phase I and II trials, and that the court misapplied the holding of <u>Ciba-Geigy Corp. v. Liberty Mutual Insurance Co. (In re Environmental Insurance Declaratory Judgment Actions)</u> ("<u>In re Environmental</u>"), 149 <u>N.J.</u> 278 (1997).

IMO sought a jury trial on its TARM and bad faith claims against the Transamerica defendants and on its bad faith denial of coverage claims against other insurers, for which it sought compensatory and punitive damages. The Transamerica defendants moved to strike IMO's jury demand, arguing that IMO's claims were predominately equitable, that all the claims that sought money damages were ancillary to IMO's declaratory judgment and specific performance claims, and that relevant case law supported dispensing with a jury in the complex circumstances of this litigation.

Judge Muir reviewed the substance of the original complaint and each amended complaint filed by IMO. He stated that the equitable or legal nature of a lawsuit is primarily determined by the remedies sought in the original complaint. Cf. Mantell v. Int'l Plastic Harmonica Co., 141 N.J. Eq. 379, 383-89 (E. & A. 1947) (parties cannot amend a pleading to change the jurisdiction of the court hearing the case). Relying on the holdings of Mantell and Boardwalk Properties, Inc. v. BPHC Acquisitions, 253 N.J. Super. 515 (App. Div. 1991), the judge determined that IMO's predominant claims were for specific performance in the future and for a declaration that defendant insurers were obligated to provide coverage for future

indemnification and defense costs. As a result, no right to a jury attached to IMO's pleadings.

"Failure to grant a constitutionally guaranteed right of jury trial is not amenable to the harmless error rule." 500 Columbia Tpk. Assocs. v. Haselmann, 275 N.J. Super. 166, 171 (App. Div. 1994). Thus, the trial court's ruling may not be disregarded if IMO had a right to a jury trial protected by our State Constitution.

IMO does not have a right to a jury trial unless such a right is in fact found in our State Constitution or in a statute. Ins. Co. of N. Am. v. Anthony Amadei Sand & Gravel, Inc., 162 N.J. 168, 175 (1999). "Without statutory authorization, a right to trial by jury does not attach to a claim if the claim did not exist at common law." In re Environmental, supra, 149 N.J. at 298.

The Declaratory Judgment Act, N.J.S.A. 2A:16-50 to -62, dictates the specifics of declaratory relief but does not provide a right to a jury trial. In re Environmental, supra, 149 N.J. at 292. Furthermore, "[d]eclaratory judgment actions were unknown at common law." Ibid. "In a declaratory judgment action, the right to a jury trial depends on whether the action is the counterpart to one in equity or law." Ibid.

In general, a jury trial is available in an action at law, but not in an action in equity. Id. at 291. To determine whether an action is legal or equitable, the court must consider the remedies requested by the complaint. Weinisch v. Sawyer, 123 N.J. 333, 344 (1991). It must look to "the historical basis for the cause of action and focus on the requested relief." Id. at 343; accord In re Environmental, supra, 149 N.J. at 293; Wood v. N.J. Mfrs. Ins. Co., 206 N.J. 562, 575 (2011). How the parties classify the matter is irrelevant; the court must examine the substance of the allegations and the relief sought. Wood, supra, 206 N.J. at 576.

IMO alleges that its third amended complaint contained prominent and independent claims for money damages, which gave it a right to a jury trial. It adds that some claims first made in the third amended complaint did not arise until six months after the original complaint was filed, and those allegations could not have been included in the original filing. Therefore, it argues, Judge Muir should not have focused on the declaratory relief IMO sought in its original complaint.

When equitable issues or defenses are presented, the matter of whether a jury trial should be granted is left to the determination of the judge. Sun Coast Merch. Corp. v. Myron Corp., 393 N.J. Super. 55, 86-87 (App. Div. 2007), certif.

denied, 194 N.J. 270 (2008).  Pursuant to the doctrine of ancillary jurisdiction, if a complaint presents a primarily equitable action but also includes causes of action at law, the court of equity can assume jurisdiction over the legal issues. Wood, supra, 206 N.J. at 575.

In Lyn-Anna Properties v. Harborview Development Corp., 145 N.J. 313 (1996), the Court held that the chancery court has ancillary jurisdiction over legal issues to the extent that those are "incidental or essential to the determination of some equitable question."  Id. at 330 (quoting Shaw v. G.B. Beaumont Co., 88 N.J. Eq. 333, 336 (E. & A. 1917)).  When a complaint seeks both legal and equitable remedies, the court must consider the nature of the controversy in addition to the requested relief.  Id. at 331.  If the predominant relief is equitable, then the legal issues are ancillary and may be decided in a bench trial.  Id. at 330.  If a legal claim is not incidental or essential to the predominant equitable remedy, then it should be severed and transferred to the Law Division.  Ibid.

Furthermore, the court may strive to dispose of all matters in a controversy in a single action if it can do so without violating a litigant's constitutional or statutory rights. Massari v. Einsiedler, 6 N.J. 303, 313 (1951).  In Boardwalk Properties, supra, 253 N.J. Super. at 526-27, we stated that the

Chancery Division can decide both legal and equitable issues and provide appropriate remedies.  We also stated that matters triable without a jury under the Constitution of 1844 are similarly triable without a jury under the Constitution of 1947. Id. at 527-28.

When legal claims arise from controversies that are independent of the equitable action, they should be tried separately before a jury.  Ibid.; see, e.g., N.J. Highway Auth. v. Renner, 18 N.J. 485, 488-89 (1955).  The court should examine the legal claims and determine if they are "so intertwined with the equitable issues that the legal issues" fall within the equity court's jurisdiction to decide them without a jury. Boardwalk Properties, supra, 253 N.J. Super. at 528.

Here, the original complaint focused on declaratory relief, although it also included prayers for compensatory and punitive damages.  Primarily, IMO sought the court's aid in defining and fixing the obligations of Transamerica and TIG in relation to the 1986 Distribution Agreement.  The crux of the complaint was the alleged "imminent" exhaustion of the TIG insurance policies. The defense costs and indemnification payments that IMO sought were in connection with pending or future asbestos cases.

The second amended complaint named several dozen excess insurers, but IMO still sought the same declaration of rights as

its original complaint and, further, a declaration of rights of IMO and the obligations of Transamerica in connection with the excess insurers.  For the most part, the asbestos claims in dispute were either ongoing or future claims.

The twenty-four counts of the third amended complaint did not change the primary relief sought.  IMO's bad faith claims were rooted in the alleged wrongful abandonment of its defense and the failure to notify IMO in advance that certain insurance policies were about to be exhausted.  Again, IMO was concerned that defendants failed or "will fail" to fulfill their obligations under the insurance contracts, and have refused or "will refuse" to defend and indemnify IMO against asbestos claims filed in New Jersey and other states.

All of IMO's pleadings sought declarations about the future obligations of defendants.  Any alleged claims of bad faith, wrongful abandonment, breach of fiduciary duty, or tortious interference stem from whether the contractual rights alleged by IMO in fact existed.  From the outset and throughout the litigation, IMO's complaints were mainly equitable.

Although additional causes of action for money damages may have arisen after the filing of the initial complaint, those claims are still intertwined with the primary events and the allegations presented in the original complaint.  See Eckerd

Drugs of N.J., Inc. v. S.R. 215, Rite-Aid Corp., 170 N.J. Super. 37, 42-43 (Ch. Div. 1979). As we have stated, they are linked to the question of whether or not the Transamerica defendants and the excess insurers had an obligation to provide ongoing or future defense and indemnification, and an earlier notice of exhaustion.

IMO argues that none of its claims fell within the exceptions to the right to a jury trial as stated in In re Environmental, supra, 149 N.J. at 291-300. In that case, the plaintiff was seeking a judgment declaring that the insurers were required to indemnify and defend for future costs of an environmental remediation action. Id. at 286. The issue on appeal was whether a constitutional right to a jury trial existed in a declaratory judgment action involving claims against insurers for breach of contract and recovery of future costs where the plaintiff also sought compensatory damages for past costs. Ibid.

The case was complex. It involved dozens of insurance companies and estimated future costs that exceeded $1 billion. Id. at 288-89. The Supreme Court observed that the action was at its root a request for specific performance of the insurance contracts because the plaintiff wished to be placed in the position it would have enjoyed had the insurers performed on the

insurance contracts.  Id. at 293-95.  In addition, specific performance was an appropriate remedy because several of the alleged breaches had not yet occurred, leaving the insured's damages incalculable.  Id. at 296.  Therefore, the plaintiff did not have a right to a jury trial.  Id. at 287, 295.  A court of equity could decide any ancillary legal issues and award money damages for past losses.  Id. at 295.

Similarly in this case, there was no right to a jury trial because IMO's complaints presented a unique and complex mass-tort insurance coverage case focused on a declaration of the parties' rights and obligations and on the specific performance of insurance contracts as so declared.  In fact, the Court in In re Environmental observed that the predominance of equitable issues combined with the complexity of the subject matter distinguished that case from other insurance actions.  Id. at 298.  The same is true here.

IMO's breach of contract and bad faith claims grew out of the same dispute and were intertwined with its equitable claims. They were based on the same facts and proofs as the claims for declaratory judgment and specific performance.  They were properly and economically adjudicated within the equity court's ancillary jurisdiction.  Wood, supra, 206 N.J. at 575.

Additionally, this case is different from <u>Ward v. Merrimack Mutual Fire Insurance Co.</u>, 312 <u>N.J. Super.</u> 162, 167-69 (App. Div. 1998), because <u>Ward</u> was a coverage case where the primary remedy sought was money for damages already incurred. The plaintiff was not making claims for any future or ongoing injury. <u>Ibid.</u>

We conclude that Judge Muir did not err as a matter of law when he denied IMO's demand for a jury trial and decided the equitable matters and the ancillary legal issues by means of bench trials.

> **[At the court's direction, the remainder of this opinion has been redacted for purposes of publication. <u>See</u> <u>R.</u> 1:36-2(d) (guidelines for publication). The full opinion is available on the Rutgers Newark School of Law website at <u>http://njlaw.rutgers.edu/collections/courts/search.php.</u>]**

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION