**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3899-18T4

KYLE J. FUNSCH,

    Plaintiff-Appellant,

v.

PROCIDA FUNDING, LLC,
WILLIAM PROCIDA,
and JOHN MULLANE,

    Defendants-Respondents.

Argued November 2, 2020 - Decided  December 3, 2020

Before Judges Sabatino, Currier and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-7221-16.

Leonard Feiwus argued the cause for appellant (Kasowitz Benson Torres LLP and Michael J. Bowe, of the New York bar, admitted pro hac vice, attorneys; Leonard Feiwus, Michael J. Bowe and Lauren Tabaksblat, on the brief).

Leo V. Leyva argued the cause for respondents (Cole Schotz PC, attorneys; Leo V. Leyva and Jason Melzer, of counsel and on the brief; Wendy F. Klein, Krista L. Kulp and Elizabeth A. Carbone, on the brief).

PER CURIAM

This appeal involves a dispute between two men about a business relationship gone awry. The relationship began in 2009 when co-defendant William "Billy" Procida hired plaintiff Kyle J. Funsch to work at Procida's real-estate investment company, Procida Funding, LLC ("the LLC" or "the Company"). Procida was the sole member of the LLC. In the ensuing years, Funsch was mentored by Procida, and handled many transactions that raised millions of dollars.

In May 2011, Procida sent an email to Funsch and another employee, co-defendant John Mullane, that is the heart of this dispute. As interpreted by Funsch, the 2011 email granted Funsch and Mullane the right to each receive a 12.5% share of the Company's net earnings, and allegedly promised them an ownership share of the business. However, the LLC's Operating Agreement was never amended to specify that Funsch had become an authorized member of the LLC, nor did it detail the terms of his alleged membership.

Eventually the relationship between Procida and Funsch deteriorated, and Funsch stopped working for the Company in December 2015. Funsch claimed an equity interest in the LLC and a right to certain additional compensation,

2

which Procida denied. According to Funsch, Procida also made disparaging statements about him to business associates and clients.

In his complaint in the Law Division, Funsch asserted that, based on the May 2011 email and other conduct by Procida holding him out at times as a "partner" or "principal," he is entitled to an equity share in the LLC as well as additional unpaid compensation. Funsch also sought damages from Procida for alleged defamation.

After a non-jury trial, the court found Funsch's claims lacking in merit. The court rejected his assertion of membership status in the LLC, finding the May 2011 email and the other evidence inadequate to make Funsch a member under the applicable LLC statutes and the Operating Agreement.

The court adopted Procida's trial testimony explaining the course of events, and concluded the parties never achieved a meeting of the minds with sufficiently definite terms to create an enforceable agreement. The court particularly noted that Funsch never agreed to or signed any of the multiple proposed amendments to the Operating Agreement that Procida presented to him. Additionally, the court dismissed Funsch's defamation claims as a matter of law, and also determined he was not owed any further compensation.

3

On appeal, Funsch variously argues: (1) the case should be reversed and remanded for a jury trial, which the trial court improperly denied; (2) he should have been declared an equity owner of the Company; (3) he is entitled to an unpaid portion of the Company's profits from 2015; (4) the court should not have excluded his damages expert's supplemental report; and (5) his cause of action for defamation should be revived.

For the reasons to follow, we affirm the court's judgment in favor of defendants.

I.

The record reveals the following relevant facts, allegations, and procedural history.

The LLC

William Procida created Procida Funding, LLC in 2008 and was the sole member at the time of its creation. The LLC is the fund manager for the 100 Mile Fund, a private equity investment enterprise launched in 2011. The 100 Mile Fund specializes in bridge, construction, mezzanine, and preferred real estate equity investments.

The LLC is governed by an operating agreement dated December 16, 2008 (the "Operating Agreement"). Pertinent to this ownership dispute, Section 1.8

4

of the Operating Agreement specifies that a new member may be admitted to the LLC upon "the unanimous written consent of [its] Members." Because William Procida was the sole member of the LLC, his personal consent was required to admit any new members.

The Business Relationship Between Funsch and Procida

The business relationship between Funsch and Procida commenced in 2009. Funsch, who is much younger than Procida, had recently launched an internet-based real estate company.

Between 2009 and 2011, Funsch, working with Mullane and under Procida's tutelage, developed and implemented a residential "fix and flip" program for the Company.

The May 13, 2011 Email

On May 13, 2011, Procida sent an email jointly to Funsch and Mullane that is at the core of this litigation. The email contains the subject line, "my new partners," and states the following:

> [Y]our work to date has been admirable and your skill sets improve daily. I am proud to work with you both (despite that I beat you to the office today) therefore I am making you partners. [T]he terms of which are as follows: for as long as you work here, you will each own and be entitled to 12.5% of the combined companies [sic] net earnings. [Y]ou will receive a draw against those earnings . . net income will be calculated

by all income less all expenses exclusive of interest income on my investments. [S]hould either of you leave the firm you will forfeit any rights to future earnings or ownership. [S]ince talk is cheap I wanted to put something in writing, so we can consider this legally binding. [A]s we've got many things to do save this email.

[(Emphasis added).]

The email continued:

[I]f I die or become disabled it is my wish that you guys own 50% and send the balance to my kids. [Y]ou are now to refer to yourselves as my partners. [W]e will fine tune this over time. [W]e will do a press release to announce this shortly.

[(Emphasis added).]

Funsch argued this email constituted "unanimous written consent" by Procida to make Funsch an equity owner in the Company. In opposition, Procida argued the May 2011 email was merely a promotion of Funsch to a salaried employee who could hold himself out publicly as a "partner" in the business, but only as long as Funsch worked at the Company.

It is undisputed that in the weeks following the May 2011 email, the Company issued multiple public announcements describing Funsch and Mullane as "partners." The announcements appeared on the Company's website and in the June 6, 2011 issue of Institutional Investor News, a trade publication.

6

As Procida conceded on cross-examination at trial, Funsch was also held out to investors, lenders, regulators, and the public on several occasions as a "principal" or "partner."   For example, these statements appeared in the following publications, filings, and communications:

- SEC Form D signed by Procida dated January 9, 2012 identifying Funsch as a "principal" of Procida Funding;

- Procida Funding's website, listing Funsch as a "Principal";

- a Final Private Placement Memorandum for the 100 Mile Fund, LLC identifying Funsch as a "principal at Procida Funding";

- a May 18, 2011 email from Procida to Gregory R. Haworth, attorney for Procida Funding, stating: "[J]ohn and [K]yle should be noted as partners in the fund manager";

- a September 22, 2012 email from Procida to a client, Salvatore Pappalardo, stating "Kyle is a partner who has successfully closed over 200 million in the last [three] years.  With several repeat customers. . . .  If u can't deal with [K]yle I'm sorry but that's how we run our company";

- an October 4, 2012 email from Procida to Carl Schwartz describing "Kyle Funsch and John Mullane.  Both partners" as "[m]y new [Z]urlini and [Mc]clain.  Great guys," thereby drawing an analogy to Procida's former equity partners in Palisades Financial, Procida's former company; and

7

- a June 8, 2015 business magazine story entitled "Urban Renewal: The money men," identifying Funsch as one of the Company's "principals" in an interview with Funsch, Procida, and Mullane, and in which Procida personally described Funsch as "the partner in charge of originations."

Defendants underscored at trial that the May 2011 email is devoid of any references to "membership," "equity," or "ownership interest" in the Company itself. They further stressed the email lacks any specific terms and/or conditions related to: (1) loss sharing; (2) capital contributions; (3) work schedule; (4) consent rights; (5) amending the books and records or other Company documents; and (6) the Company's debts.

As further counterproof, defendants cited to an email sent by Procida on July 26, 2011 to Funsch, Mullane, and third parties, asserting that Procida owned "100%" of the Company and that "[J]ohn and [K]yle are cash flow partners." [(Emphasis added).]

Defendants also stressed that Funsch never received a Schedule K-1 or any membership certificates; made any capital contributions to the Company; executed any amended operating agreement for the Company; shared in the Company's losses; or managed the Company or possessed any voting rights of any nature.

In another email chain on February 8, 2012 between Funsch and Ali Betts, the controller of the Company, Betts stated that Funsch needed an "official partnership agreement with [Procida], not an email, not today you are his partner[], tomorrow his junior partner[], then his employee[], then his kid[] . . . a real agreement with 3 . . . count them 1 2 3 signatures from all parties!" [(Emphasis added).] Funsch responded:

> I will speak for myself in saying that I will not sign documents, represent the company nor my family when I have [zero] say. The one thing at Palfi [Procida's former company] that [Procida] attributes to failure was control, that isn't changing this time around. Sometimes a little input is helpful but it's extremely difficult when you are treated as a pawn in a game of chess.

> [(Emphasis added).]

Later, in his testimony at trial, Funsch acknowledged that he never sought a "partnership agreement" from Procida.

In December 2012, Procida raised the revenue-sharing percentage earned by Funsch and Mullane from 12.5% to 15% each. Procida wrote an email on December 20, 2012 to, among others, Procida's attorney, stating, "I want to amend the [P]rocida [F]unding operating agreement to admit [K]yle. [A]nd [J]ohn as [straight] up 15% partners. Effective [J]an. 1." As instructed by this

email, Funsch and Mullane were thereafter compensated at the rate of 15% of net earnings.

As we have already noted, the parties never executed an amended Operating Agreement.  Between 2012 and 2015, a series of four draft proposed amendments were circulated between Procida and Funsch, along with other persons.  But none of these proposed amendments were signed or agreed to by Funsch.

In one such proposed amendment, the terms of which were explained in a June 19, 2015 email from Procida, he made clear that he would still retain exclusive control over any and all Company decisions.  For example, Procida's exclusive authority would extend to any decision to stop cash flow distributions, or to remove any "operating manager" from the Company if that individual performed a so-called "bad boy act."  As Procida described in his email, such "bad boy acts" would include "lying cheating or stealing or violating the moonlighting clause," and whether such an act occurred would be determined at his own "sole discretion."

Funsch did not respond to the June 19, 2015 email from Procida.  Indeed, the only action Funsch appeared to take in connection with the proposed Operating Agreement amendments was when he forwarded an email to his

10

mother in October 2015 with Procida's comments about such a proposal. Funsch wrote his mother, "[Procida] produced an unassignable document then gives [four] business days [for me] to review and give comments. It took [four] years to get a document." In her reply, Funsch's mother, who evidently has business experience, questioned what advantage it would be for Funsch to be a member of the Company. She suggested to him that he instead "just [get] a contract that says [he] is entitled to [a rate of] 13.04% [in compensation]."

The parties disputed the legal significance of the exchange of drafts of proposed amendments to the Operating Agreement. Funsch argued the drafts "continued to recognize [his] and Mullane's previously conferred status as members." By contrast, defendants argued that such proposed amendments constituted mere negotiations that, only if fully consummated, would elevate Funsch and Mullane from employees to "partners."

As support for their position, defendants noted that throughout his time at the Company, Funsch received W-2s,[1] the type of tax form an employee

---

[1] IRS Form W-2 (entitled "Wage and Tax Statement").

A-3899-18T4

receives, as opposed to a K-1 form,[2] which a partner in a firm typically receives.[3]

Defendants also pointed out that Funsch "never asked why he was not receiving a Schedule K-1 for his share of Company profits, despite knowing what a Schedule K-1 was and having a family accountant at his disposal."  Defendants further noted that, in 2012, Funsch "requested that Procida increase his base salary."  [(Emphasis added).]

Termination of the Business Relationship Between Funsch and Procida

The parties sharply disputed at trial whether Procida fired Funsch or Funsch voluntarily quit.  The record is clear that, towards the end of their business relationship, Funsch and Procida frequently argued in the office.

The tensions reached an apex on December 17, 2015, when Funsch and Procida had an altercation.  According to Funsch, he attempted to avoid escalating the altercation by walking away, but Procida followed him into the parking lot and "continued to scream" at him.  Procida's version was that while

---

[2]    Schedule K-1 (IRS Form 1065, entitled "Partner's Share of Income, Deductions, Credits, etc.").

[3]   Funsch's W-2s reflect he earned $109,038.50 in 2012, $185,577.03 in 2013, $306,601.16 in 2014, and $282,985.07 in 2015.  Funsch testified at trial that he believed he was entitled to an additional sum of approximately $200,000 for work he performed in 2015 but was unable to substantiate that full figure.  He presently asserts he is owed a lower figure of $65,638.93 for 2015.

he was "yelling" orders in the office, Funsch stood up and suddenly and belligerently proclaimed to him, "[D]o you have to talk so damn loud?" and left the office. Procida recalled he followed Funsch into the hallway to ask what was going on, to which Funsch responded, "[I]t's your f***ing [C]ompany, do what you want," and sprinted down to the parking lot. According to Procida, he followed Funsch to the parking lot, whereupon Funsch jumped into his car and began to drive away.

Following the December 17 altercation, according to Procida, Funsch's resignation was thereafter accepted. Procida further asserts in his brief, "out of an abundance of caution, a text message[4] was sent to Funsch confirming that he was no longer associated with the Company."

Funsch admitted that he drove away from Procida after the altercation, but noted there is no evidence that he ever tendered his resignation. Funsch argues in his brief that Procida sent the post-altercation text message "purporting to fire

---

[4] The text message states:

> I think that this relationship is over. We will discuss an unwind tomorrow. No need to come back to the office now or ever[.] Leo [his attorney] will be sending u formal notice. I ask that u don't go to the office today or tomorrow. We will arrange for u to get your personal belongings. Pls don't make me have u removed.

[Funsch], even though he lacked the authority to do so under the 2008 Operating Agreement." That argument presumes that Procida had made Funsch a member of the LLC before the altercation.

Events After Funsch's Departure

According to Funsch's testimony, he has been unemployed since leaving the Company in 2015, aside from a brief foray into starting his own limited liability company. As of the time of trial, he reportedly had applied to about four jobs over three years.

Funsch alleged he has been unable to find work because Procida "intentionally disparaged and defamed [Funsch's] work performance to, among others, [Funsch's] colleagues, and prospective investors, partners, and employers."

As support for this claim, Funsch cited two emails: one Procida sent the day after Funsch's departure to the entire staff at the Company, berating their performance and questioning why he had to perform everyone else's work and beseeching them to do better. The other email was the previously mentioned email forwarded by Procida to two of the Company's main investors, with the following message:

> No need to be alarmed but as my valued friends, trusted advisors and my [two] most important investment

> partners I needed u to be aware of the below email which is only a small part of why I had to terminate [K]yle yesterday which trust me was one of the most difficult decisions of my life[.]

Defendants disputed plaintiff's claim of intentional wrongdoing by pointing out that a few weeks after Funsch left the Company, Procida "attempted to assist Funsch to find another job that would have paid $300,000.00 a year."

The Trial Court's Decision

After considering the documentary exhibits, the trial testimony of Funsch, Procida, and other witnesses, and the arguments of counsel, the trial court issued a fifteen-page written decision on April 15, 2019, ruling in defendants' favor.

With respect to Funsch's central claim of an ownership stake in the LLC, the court found the evidence "demonstrated that Mr. Funsch did not have, and knew he never had, a membership interest in Procida Funding." The court reasoned that under both the New Jersey Limited Liability Company Act (the "LLCA"), and the New Jersey Revised Limited Liability Company Act (the "RULLCA"), a "member" of an LLC is a person who has been admitted as "provided in and upon compliance with the [LLC's] operating agreement." N.J.S.A. 42:2B-21(b)(1) (the LLCA provision); N.J.S.A. 42:2C-31(c)(1) (the cognate RULLCA provision).

Here, the sole executed Operating Agreement clearly established that Procida, the Company's founder, was the sole member of the LLC. Under the express terms of the Operating Agreement, Funsch could only be admitted as a member with Procida's "prior unanimous written consent." The court found that Procida "did not consent, in writing or otherwise, to Mr. Funsch's admission as a member."

The court recognized the series of four proposed amendments to the Operating Agreement would have admitted Funsch as an LLC member "if finalized and executed," but that he "rejected each and every [such] draft agreement." The court added that "[t]he existence of ongoing negotiations concerning Mr. Funsch's admission, demonstrates that the parties had never come to any agreement." The court insightfully added its perception that the various communications between the parties about the draft agreements evidenced "a reluctance by [Funsch] to consummate an agreement, where instead of just receiving income from [the Company], he would potentially face liability."

The court flatly rejected Funsch's contention that the May 2011 email sufficed to imbue him with the legal status of a member of the LLC. As the court observed, the email "does not state that it is amending or supplementing

16

the operating agreement." The court further noted the email "lacks core, basic, and material terms relating to Funsch's relationship with Procida Funding" that would be expected to be included in an amendment admitting a new member. For example, the court pointed out the email omitted any provisions addressing such topics as loss sharing, capital contributions, and consent rights.

The court further underscored that the May 2011 email promised Funsch a percentage of the Company's net earnings only "for as long as [he] work[ed] [there]," and that "should Funsch leave the firm [he] will forfeit any rights to future earnings or ownership." The court agreed with defendants that the message was "simply an email notifying Mr. Funsch about his promotion and altering the manner in which [his] compensation was calculated." The court also found significant that the May 2011 email was thereafter "clarified" by Procida's July 26, 2011 email, which specifically referred to Funsch and Mullane as "cash flow partners," and not members. The court further noted that Funsch confirmed he was paid as a W-2 employee and did not receive any K-1 forms reflecting any owner distributions.

In addition, the court rejected Funsch's argument that the various press announcements and other statements Procida made to third parties referring to Funsch and Mullane as "partners" and "principals" were sufficient to grant them

17

the legal status of members in the LLC. The court cited Procida's testimony that he imprecisely used the term "partner" and similar words "to inveigh apparent authority for negotiation purposes, but not to confer [upon Funsch and Mullane] LLC membership status."

The court summarized its rejection of plaintiff's ownership claim as follows: "At best the evidence only demonstrates that Mr. Procida was considering admitting Mr. Funsch and that there were ongoing negotiations over same." More pointedly, the court characterized Funsch's claim of ownership as "absolute folly," and that "any claim [he] somehow thought he was a member of the LLC or somehow entitled to be a member is entirely fallacious."

The court further determined in its findings of fact that Funsch had voluntarily resigned from the Company when he walked off the premises in December 2015 and did not return. Because of that voluntary departure, Funsch was not entitled to any more payment from the Company's earnings for 2015, consistent with the conditions set forth in the May 2011 email.

With regard to plaintiff's defamation claim, the court acknowledged that at times Procida used coarse and sometimes profane language to criticize Funsch and other employees of the Company. The court also acknowledged that Procida "clearly is a hard-driving real estate entrepreneur," and that in this "highly

18

stressed . . . business milieu," Procida "would scream and be abusive." Even so, the court found no evidence that Procida had defamed Funsch to others.

The court determined in this regard that an August 11, 2015 email Procida sent to John Newman, which contained a line saying that "[m]y guys suck," did not identify Funsch or any another individual personally. In addition, the court found that a long email Procida sent to Company staff the day after Funsch's departure, alluding to a previous "famous blow out" with Funsch, did not rise to actionable defamation. Further, the court rejected Funsch's claim that a private text message Procida sent to Funsch about this litigation and disclaiming liability was likewise not a viable basis for a defamation claim.

On the whole, the court determined that Procida's critiques of Funsch's work amounted to "non-actionable statements of opinion." The court further noted that Funsch had not produced at trial any witness who received or had been affected by the allegedly defamatory statements, or any proof that the statements were harmful to Funsch. The court rejected Funsch's theory that the statements were so pernicious as to be defamatory per se.

The present appeal followed.

A-3899-18T4

II.

We first address Funsch's argument that he was unfairly denied the opportunity to have his claims tried by a jury. In approaching that issue, we recognize that Funsch included a jury demand with his complaint in accordance with Rule 4:35-1(a).

We are mindful that during a colloquy with the court on March 3, 2017, when the attorneys appeared that day to argue a defense motion to dismiss the complaint, the lawyers and the judge mentioned on the record that a jury trial had been requested. At that time, the judge stated he anticipated that equitable facets of the case would be decided by the court after a jury first decided "the legal issues[,] which would be contract or – or defamation."

Nevertheless, for reasons that are not clear to us from the record, the trial court's docket entries at some point classified this lawsuit as a non-jury case, despite the jury demand accompanying the complaint. This apparently led to the case being assigned a trial date for a non-jury proceeding in early November 2018.

On October 12, 2018, counsel appeared for oral argument on defendants' motion for summary judgment. At that motion argument, Funsch was represented by a different partner of the law firm because the partner's colleague

who had been primarily handling the case was in trial on another matter. During the course of that October 2018 proceeding, which was more than eighteen months after the March 2017 hearing, the following discussion took place about whether the case would be tried by a jury:

> THE COURT: Well shouldn't -- now let's cut to the chase. Shouldn't we wait to hear the [evidence of an alleged creation of an ownership interest] in court? <u>We have a trial date, a bench trial, on 11-13-2018 and then we can find out</u> if [such a right] ever really was really [e]nunciated.
>
> DEFENSE COUNSEL: Absolutely not, Your Honor.
>
> THE COURT: Okay.
>
> DEFENSE COUNSEL: Because the undisputed facts that he was never listed as an owner on the tax returns, never insisted he was an owner --
>
> THE COURT: Well, it will be a real short trial then, right?
>
> DEFENSE COUNSEL: But that's not what the standard is here.
>
> THE COURT: Okay.
>
> [(Emphasis added).]

The argument then focused on the May 2011 email:

> DEFENSE COUNSEL: The e-mail says what it says, it's not a matter -- <u>it's not a matter for a jury</u>.

THE COURT: Well, <u>I have to find out</u> if he left [the Company] or not even, <u>don't I</u>?

DEFENSE COUNSEL: He left, he's not there.

[(Emphasis added).]

A few minutes later, plaintiff's counsel, who had not previously appeared in the case, rose to present his opposition to defendants' summary judgment motion:

PLAINTIFF'S COUNSEL: I had to parachute into this case about a month ago because [my partner], who has been taking lead on it has been handling it for a couple of years, is trying the case in Morristown and in fact, I think she's waiting for a jury today. So you know, I apologize that she couldn't be here --

THE COURT: Yeah because we -- <u>by the way, November 13th is the main event, we're not cancelling that</u>.

PLAINTIFF'S COUNSEL: Yeah, I --

THE COURT: <u>When I write down a trial day on a complex commercial date, that's the date we're going, it's a done deal, unless you lose your motion today</u>.

PLAINTIFF'S COUNSEL: Right.

THE COURT: So tell me –

PLAINTIFF'S COUNSEL: Well, Your Honor, first of all --

THE COURT: -- about facts.

PLAINTIFF'S COUNSEL: -- we do welcome that date and we're pleased that we're finally getting an opportunity. You did mention, though, that it was a bench trial. We do have a jury demand on the front page of our complaint. So --

THE COURT: Well, it's been listed as no jury for the entire time. It's --

PLAINTIFF'S COUNSEL: Well, there's a -- there is a jury demand in our complaint, Your Honor.

THE COURT: I don't know about that. We put this down as a non-jury trial forever.

DEFENSE COUNSEL: That's our understanding too, Your Honor.

PLAINTIFF'S COUNSEL: I don't know, I think that's an --

THE COURT: So you can try to figure out how you can now change it to a jury trial but it's not going to happen, I don't think.

PLAINTIFF'S COUNSEL: Your Honor, if you look at page 12 of our complaint --

THE COURT: I'm not looking at page 12 of your complaint. This thing has been marked as a non-jury case. It was stipulated as that, it was set down as that and for you to now pull out a complaint at last minute, as a substitute attorney, and say it's going to be a jury trial, isn't going to happen.

PLAINTIFF'S COUNSEL: And Your Honor, quite frankly, quite frankly, as I said, I haven't been working

23

on it. If there was such a stipulation, I'm not aware of it so I apologize.

THE COURT: And even if there wasn't, that's the way this thing has been already carried for the whole nine yards.

PLAINTIFF'S COUNSEL: Right.

THE COURT: I didn't come up with it because when I came up with the whole idea of when we were going to do it, that's how I slipped it in. I knew I could do it as a non-jury trial and fit it in with the way scheduling is.

PLAINTIFF'S COUNSEL: Understood and I appreciate Your Honor clarifying it for me because I was unaware of that but --

THE COURT: Anyway, tell me the facts.

PLAINTIFF'S COUNSEL: Certainly.

[(Emphasis added).]

Plaintiff's counsel then proceeded to present his arguments opposing the dispositive motion, and there was no further discussion about the court's clear plan to try the case without a jury. As it turned out, plaintiff successfully convinced the court to deny summary judgment and the case proceeded to a bench trial on November 13. In the meantime, no one from plaintiff's law firm wrote the court a letter or filed a motion asking the judge to reconsider his decision to try the case without a jury.

Based on what has been presented to us on appeal, the court evidently was mistaken in several respects about the jury demand. There is no evidence presented to us of any stipulation of the parties to waive a jury.

In addition, the judge's observations on October 12, 2018 that the case had been listed as a non-jury case from its inception are contradicted by the discussion at the earlier proceeding in March 2017 about using a jury in the case to decide certain issues. It may well be that, without a transcript[5] to consult, the judge simply did not remember what was said at the earlier session that occurred more than a year before, and was relying on the docket's "non-jury" entry. It is also possible that defense counsel, who personally had not appeared at the March 2017 session, was unaware of those discussions about a jury trial.

Funsch argues that the court unfairly deprived him of a right to jury trial, brushed aside his jury request, and afforded his attorney no fair chance to show that the docket's non-jury designation was mistaken. He requests that the evidence and the results of the bench trial be swept aside and the case remanded for a new trial, this time by jury.

---

[5] A transcript of the March 3, 2017 proceeding was not prepared until the present post-judgment appeal.

A-3899-18T4

In opposition, defendants argue that plaintiff and his counsel waived his right to a jury trial by acquiescence. They do not assert, however, that there had been a stipulation with a jury waiver. They note that after the October 12 proceeding, plaintiff did not submit any jury voir dire questions or proposed jury charges in accordance with <u>Rule</u> 4:25-7 and Appendix XXIII of the Court Rules. Nor did plaintiff attempt to move for leave to appeal seeking relief from this court, although we note such interlocutory review would have been discretionary. <u>See</u> <u>R</u>. 2:5-6.

It is possible that plaintiff, having succeeded in persuading a judge who planned to be the factfinder at trial to deny defendants' motion for summary judgment, could have strategically decided to accept the judge for that role. Or perhaps, on reflection, the client and counsel might have felt that a swifter trial date and a less costly trial without the extra time and expense of jury selection, jury instructions, and deliberations was to their potential benefit. We simply do not know what, if any, strategic factors may have affected plaintiff's lack of further action in the intervening four weeks before the bench trial started.

It is well established that waiver is a "voluntary relinquishment of a known right" evidenced by a clear, unequivocal, and decisive act from which an intention to relinquish the right can be based. <u>Sroczynski v. Milek</u>, 197 N.J. 36,

63-64 (2008) (quoting Knorr v. Smeal, 178 N.J. 169, 177 (2003)). At times, a waiver may be implied by conduct or acquiescence. Guber v. Peters, 149 N.J. Super. 138, 140 (App. Div. 1977) (holding that the defendants had waived their right to a jury trial requested in their initial pleadings by failing to press that right to the court thereafter). Silence by counsel may be construed in appropriate circumstances as waiver of a jury. See, e.g., Van Note-Harvey Assocs., P.C. v. Twp. of E. Hanover, 175 N.J. 535, 541 (2003) (holding that defendants waived any right to have a jury decide prejudgment interest claims by failing to object after the court repeatedly made clear that the court would decide that interest claim post-trial).

That said, we also recognize the trial judge put plaintiff's counsel, who was appearing for the first time in the case, in an awkward situation by mistakenly telling him the case had always been regarded as a non-jury matter and suggesting, without a contrary word from defense counsel, that there was a stipulation to that effect. The judge should have afforded counsel a fuller opportunity to state his concerns on the record after telling him in no uncertain terms that a jury trial "is not going to happen."

To be sure, plaintiff's attorney did not voice the words "I object" after the judge interrupted him, and instead politely thanked the judge for "clarifying" the

27

topic. Plaintiff argues his counsel made a sufficient attempt to preserve his opposition to a bench trial under Rule 1:7-2, and that we should deem that attempt to be a valid continuing objection which preserved his right to appeal. In this regard, we bear in mind the Supreme Court's observation in Mead v. Wiley Methodist Episcopal Church, 4 N.J. 200, 205 (1950), that "[c]ounsel is not required to continuously object or take exception to a [ruling] he deems erroneous after having made known his objection and clearly stating the grounds therefor."

We also appreciate that an attorney in counsel's shoes might have wanted to avoid possibly antagonizing the court by renewing opposition to a bench trial, since the judge had made clear there would be no jury and would thus be the trier of fact. However, we caution that it is wrong to ever presume that a judge will not abide by his oath and ethical duty to judge the merits of a case fairly, just because the judge made a certain pretrial ruling on an issue against that party. See Liteky v. United States, 510 U.S. 540, 550-56 (1994) (observing that a judge's ability to decide a case fairly should not be impugned simply because the judge made earlier rulings against that litigant). And, although the judge had stated his plan to try the case without a jury firmly, we will not presume the judge would have denied fair consideration to a further application by plaintiff

for relief, particularly if the judge had been presented with a transcript of the March 2017 proceeding showing what had been discussed earlier, or an acknowledgment by defendants of that discussion. We will not presume the judge was incapable of changing course, once apprised of a fuller and accurate background.

Given the circumstances, we decline to resolve the thorny question of whether plaintiff's attorney's comments to the court on October 12 and subsequent participation in the bench trial amounted to a waiver of the claimed right to a jury trial. It is unnecessary for us to do so because, upon a closer assessment of the issues, there was no jury right to be waived on a viable claim.

The right to a civil jury trial is preserved federally as the Seventh Amendment to the United States Constitution. Allstate N.J. Ins. Co. v. Lajara, 222 N.J. 129, 141 (2015). However, the Seventh Amendment guarantee "extends only to federal trials because the Seventh Amendment has not been made applicable to the States through the Fourteenth Amendment's Due Process Clause." Ibid. Thus, "the right to a trial by jury in New Jersey must arise under either a statute or the state constitution." Ibid. (quoting In re Env't Ins. Declaratory Judgment Actions, 149 N.J. 278, 292 (1997)).

A-3899-18T4

As the Court in <u>Lajara</u> noted, New Jersey's constitutional jurisprudence dictates that the right to a jury trial only applies to causes of action that sound in law rather than equity, which entails not only looking at whether the remedy is legal in nature, but also whether the cause of action resembles one that existed at common law. <u>Id.</u> at 142. Here, Funsch's core contention that he is entitled to be declared a member of the LLC under the applicable statutes and Operating Agreement is fundamentally an issue for the court rather than one cognizable as a common law claim suitable for a jury.

Our opinion in <u>IMO Indus. Inc. v. Transamerica Corp.</u>, 437 N.J. Super. 577, 636 (App. Div. 2014), finding no viable right to a civil trial by jury, is instructive. In that case, the plaintiff sought a jury trial on certain of its claims seeking compensatory and punitive damages. Nonetheless, we held that the original complaint primarily focused on declaratory relief, seeking the court's aid in defining and fixing the obligations of the defendants pursuant to an agreement between the parties. <u>Id.</u> at 634. We also noted the damages that the plaintiff sought were in connection with pending or future obligations of the defendants. <u>Ibid.</u> Consequently, the case was not one in which a plaintiff had a right to a trial by jury. As Judge Ashrafi wrote:

> All of IMO's pleadings sought declarations about the future obligations of defendants. <u>Any alleged claims of</u>

> bad faith, wrongful abandonment, breach of fiduciary duty, or tortious interference stem from whether the contractual rights alleged by IMO in fact existed. From the outset and throughout the litigation, IMO's complaints were mainly equitable.

[Id. at 634-35 (emphasis added).]

Similarly here, Funsch's contentions that he had the legal status of an equity "member" of the LLC are mainly equitable in nature. His claims for additional monetary compensation are predicated upon a legal assessment as to whether the parties' course of conduct rises to a level that satisfies the membership criteria of the LLC statutes (the LLCA and the RULLCA) and the unamended Operating Agreement. That assessment was based on documentary evidence, such as the May 2011 email and other written statements, the existence of which was undisputed. What the parties essentially fought over at trial was the legal import of those statements. The assessment of ownership or membership status inherently involved complex issues of contract law, business law, and statutory law. Arguably, the only credibility issue at trial concerned exactly what occurred in December 2015 when the parties had an argument and Funsch left the building. But that discrete event did not bear upon the core legal issue of whether Funsch was a member of the LLC.

We are cognizant that, in some breach-of-contract cases, it may be appropriate for a jury to resolve disputed issues of fact, and, as plaintiff's counsel reminds us, model civil jury charges are available for such cases. But here the predicate dispute was not about what was said or done, but rather the legal consequences of the parties' actions and inactions. Those were appropriate issues for the court to decide, not a jury. If, hypothetically, the court had decided that Funsch was indeed a member of the LLC with an equity share, then perhaps the residual dispute over whether Funsch was entitled to further compensation might have been an appropriate damages issue for a jury. But no such membership status was ever established as a matter of law. And, to the extent that Funsch contends as an alternative claim that he was short-changed in his 2015 payout as a mere employee, that subsidiary issue does not alter the primary thrust of the case as a whole.

We do agree with plaintiff that his claim of defamation, had it been viable, would have been appropriate for a jury. Even so, for the reasons we briefly discuss in Part IV, the evidence that emerged at trial shows there was no genuine issue of material fact for a jury to decide because there was insufficient proof of the legal elements of such a claim.

32

In sum, waiver or no waiver, plaintiff was not deprived of an enforceable right to a jury trial. There is no need for the case to be tried anew before a jury.

III.

We turn to the substance of plaintiff's arguments, specifically his contentions that the trial court misapplied the law and lacked a sufficient basis in the evidence to conclude he never became a member of the LLC with an equity interest in the Company. We further consider plaintiff's claim that the trial court erred in rejecting his claim for additional compensation.

In assessing these points, we are guided by well-established principles of appellate review. An appellate court shall "not disturb the factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Seidman v. Clifton Sav. Bank, 205 N.J. 150, 169 (2011) (quoting In re Trust Created by Agreement Dated Dec. 20, 1961, 194 N.J. 276, 284 (2008)); see also Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985) (noting the trial court's "major role is the determination of fact"); Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974). We only review de novo the trial court's

33                                                    A-3899-18T4

legal determinations.  <u>30 River Ct. E. Urb. Renewal Co. v. Capograsso</u>, 383 N.J. Super. 470, 476 (App. Div. 2006) (citing <u>Rova Farms</u>, 65 N.J. at 483-84).

Applying that scope of review, we affirm the trial court's substantive decision, substantially for the sound reasons set forth in its detailed written opinion dated April 15, 2019.  We need not reiterate that analysis here, as we are satisfied the court correctly applied the LLC statutes and the Company's Operating Agreement, and that the court's conclusions have ample support in the evidence.

We agree with the trial court that the May 2011 email was simply too incomplete and indefinite to establish the necessary terms to elevate Funsch to membership status in the LLC.  We also concur that Funsch's admitted steadfast refusal to execute any of the proposed draft Operating Agreements severely undermines his claims.  We are likewise convinced that the parties' course of conduct and Procida's imprecise references to Funsch as a "partner" were insufficient to grant him the legal status of a member.[6]

---

[6]  That said, we do note some concern about Procida's representation to the SEC on the Form D filing stating that Funsch was a "principal" of the LLC, but the truth and materiality of that representation would be more appropriate for securities regulators or investors to address, if at all, <u>see</u> 17 C.F.R. §§ 230.501 and 230.503(a) (concerning Form D disclosure requirements), and does not control the internal relationships of these parties under the LLC statutes.  We do not make any ruling here about that issue.

We reject plaintiff's argument that the court focused unduly in its analysis upon the absence of any capital contribution by Funsch. Although we are mindful that the statutes do not require a person to make a capital contribution in order to become a member of an LLC, it still can be one indication of such membership rights. The court duly considered several other factors apart from the absence of a capital investment in soundly concluding that Funsch never attained the status of a member in the LLC.

We likewise uphold the court's determination that Funsch was not owed any additional compensation for 2015 after his departure from the firm. The May 2011 email, on which Funsch so heavily relies as part of his ownership claim, specifies that "should either of you [Funsch or Mullane] leave the firm you will forfeit any rights to future earnings or ownership." The trial court determined, as a matter of fact, that Funsch voluntarily resigned after the argument with Procida on December 17, 2015. That finding of fact, even if it can be reasonably debated, is supported by ample evidence to deserve our appellate deference. Rova Farms, 65 N.J. at 484.

Further, even if this court held Funsch had been duly admitted as a member pursuant to the 2008 Operating Agreement, the distinction between voluntarily leaving and being fired would not affect his claim of an equity share

A-3899-18T4

in the enterprise. The Operating Agreement provides in Section Eight that a member can only sell, assign, or otherwise dispose of his interest in the Company with the "prior written consent of a majority of the other nontransferring [m]embers" or if he dies, becomes incompetent, or goes bankrupt.

As the trial court correctly noted, the default "statutory provisions" of the LLCA and RULLCA[7] apply only in the absence of an operating agreement. Hence, the language in Section Eight of the Operating Agreement controls here.[8] See Union Cnty. Improvement Auth. v. Artaki, LLC, 392 N.J. Super. 141, 152 (App. Div. 2007); IE Test, LLC v. Carroll, 226 N.J. 166, 178 (2016). Under that

---

[7] It appears the LLCA would apply to this case, as the "alleged operative event," i.e., the May 2011 email, occurred prior to the effective date of the RULLCA.

[8] The Operating Agreement further states in Section Eight that:

> The value of each Member's Interest in the Company will be determined on the date this Agreement is signed, and the value will be endorsed on Schedule 3 attached . . . . The value of each Member's Interest will be redetermined unanimously by the Members annually . . . .

While Funsch produced expert testimony on the valuation of the Company at trial, the fact that he never signed a revised Operating Agreement and never completed its pursuant "Schedule 3" lends further support to his status as an employee rather than an equity owner, as it is unclear what exactly his share of the Company would be.

A-3899-18T4

provision, Funsch had no viable claim for a buyout of his alleged interest in the Company.

We also defer to the trial court's determination that Funsch was not owed any additional compensation for 2015 for the period preceding his walkout. The court reasonably relied in this regard on the Company's Profit and Loss Statement for 2015.

Funsch argues the trial court should not have relied on the 2015 Profit and Loss Statement, since it only reflects Funsch's alleged share of the profits, prior to so-called "audit and 'true-up,'" not what Funsch was actually paid during this period. Funsch asserts he is entitled to an additional $65,638.93 for 2015. Funsch also argues he should have been awarded additional profits from the Company derived from the "promote" of loans originated by the 100 Mile Fund, which he says were typically distributed in the first quarter of the following year and would not have been reflected on the 2015 Profit and Loss Statement.

In response, defendants note the only competent evidence produced by Funsch to support his claim is the 2015 Profit and Loss Statement, which demonstrates "the profits of the Company for all of 2015 – not the relevant period January 1, 2015-December 17, 2015 (the time frame in which Funsch was still employed)." Defendants point out it is "entirely possible that the Company

A-3899-18T4

closed deals after December 17, 2015 (prior to year-end [sic]) thus earning profits after Funsch was no longer employed" and which profits he would not be entitled to collect. Defendants thus assert that Funsch did not meet his burden to demonstrate what the Company's profits were as of December 17, 2015.

We agree with defendants that plaintiff has failed to show the trial court clearly erred in rejecting his claim to an additional $65,638.93 in compensation. While not explicitly stated, Funsch appears to calculate the figure of $65,638.93 by subtracting the total wages he received (less income tax withheld) on his 2015 W-2, i.e., $282,985.07, from the total amount of distribution on the 2015 Profit and Loss Statement, $348,624. However, Funsch does not compare the 2015 Profit and Loss Statement to the 2014 Profit and Loss Statement, which comparison helps explain the approximately $23,000 decrease in his salary in 2015 from 2014. In 2015, the Company's net income was approximately $125,000 less than its net income in 2014, resulting in a decrease in Funsch's distribution on the Profit and Loss Statement, from $367,724 in 2014 to $348,624 in 2015. That appears to account for the difference between Funsch's 2014 and 2015 W-2s, reflecting that he took home $306,601.16 in wages in 2014 and earned $282,985.07 in 2015. Although that comparison does not refute

Funsch's claim for additional compensation in its entirety, it undercuts his quantification of a shortfall of over $65,000.

Additionally, Funsch does not reconcile his admission that he would not be entitled to any "future earnings or ownership" with his argument that he is entitled to the so-called "promote," i.e., additional profits calculated following the Company audit and "true-up," which for 2015 was computed and distributed in the first quarter of 2016. Funsch admitted in his brief that the promote is calculated at the conclusion of each calendar year and disbursed in the first quarter of the following year, but he does not explain why he was entitled to such profits when his relationship with the Company ended on December 17, 2015.

Given our limited scope of appellate review, and bearing in mind that Funsch bore the burden of proof on his claims, we are unpersuaded that the trial court clearly erred in its denial of additional compensation.

IV.

We briefly address the rejection of Funsch's claim for defamation. We concur with the trial court that Funsch failed to put forward sufficient evidence to sustain such a cause of action.

A-3899-18T4

To succeed on a defamation claim, a plaintiff is obligated to prove by a preponderance of the evidence that the defendant: (1) made false and defamatory statements of fact about plaintiff, (2) to third parties in a non-privileged setting, (3) depending upon the nature of the speech and the plaintiff, with either knowledge that the statements were false, a reckless disregard for the truth or falsity of the statements, or negligence in failing to ascertain the truth or falsity of the statements.  See G.D. v. Kenny, 205 N.J. 275, 292-93 (2011) (citing DeAngelis v. Hill, 180 N.J. 1, 13 (2004)); see also Restatement (Second) of Torts § 558 (1977).

Importantly, a defendant's statements of opinion about a plaintiff, rather than of fact, are not actionable defamation.  As the trial court properly noted, "[s]tatements of opinion, like unverifiable statements of fact, generally cannot be proved true or false." Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 167 (1999). Moreover, "insults, epithets, name-calling, and other forms of verbal abuse, although offensive, are not defamatory."  Ibid. (citation omitted).  Here, the various negative things that Procida said about Funsch after their relationship devolved are fundamentally expressions of opinion.

Moreover, as an independent basis for rejecting the defamation claim, the court reasonably determined that Funsch failed to identify any person who

received Procida's communications and, as a result, thought less of him. Plaintiff failed to show that a particular prospective employer or client was aware of or affected by Procida's words. To be sure, certain slanderous statements can be defamation per se and enable reputational damages to be presumed, see W.J.A. v. D.A., 210 N.J. 229, 240 (2012). However, we are unpersuaded that Procida's utterances conveying negative opinions about plaintiff (and, for that matter, at times about other employees at his company) comprise actionable false statements of fact.

To the extent we have not otherwise addressed them, the balance of plaintiff's arguments, including his claim the trial court abused its discretion on evidential rulings, lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3899-18T4